# United States Court of Appeals for the Federal Circuit

04-1428

MOTION SYSTEMS CORPORATION,

Plaintiff-Appellant,

v.

GEORGE W. BUSH, President of the United States,
and ROBERT B. ZOELLICK, United States Trade Representative,

Defendants-Appellees,

and

CCL INDUSTRIAL MOTOR LTD.,

Defendant-Appellee.

Richard C. King, Fitch, King and Caffentzis, of New York, New York, argued for plaintiff-appellant. With him on the brief was James Caffentzis.

Stephen C. Tosini, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendants-appellees George W. Bush, President of the United States and Robert B. Zoellick, United States Trade Representative. With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director. Of counsel was Maria Pagan, Office of the United States Trade Representative, of Washington, DC.

Michael P. House, McDermott Will & Emery LLP, of Washington, DC, argued for defendant-appellee CCL Industrial Motor Ltd. With him on the brief was Raymond Paretzky. Of counsel was David J. Levine.

Appealed from: United States Court of International Trade

Judge Timothy C. Stanceu

# United States Court of Appeals for the Federal Circuit

04-1428

MOTIONS SYSTEMS CORPORATION,

Plaintiff-Appellant,

v.

GEORGE W. BUSH, President of the United States, and
ROBERT B. ZOELLICK, United States Trade Representative,

Defendants-Appellees,

and

CCL INDUSTRIAL MOTOR LTD.,

Defendant-Appellee.

_____

DECIDED:   February 10, 2006

_____

Before MICHEL, <u>Chief Judge</u>, NEWMAN, MAYER, LOURIE, <u>Circuit Judges</u>, CLEVENGER, <u>Senior Circuit Judge</u>, RADER, SCHALL, BRYSON, GAJARSA, LINN, DYK, and PROST, <u>Circuit Judges</u>.

Opinion for the court filed PER CURIAM.  Opinion concurring in part and concurring in the judgment filed by <u>Circuit Judge</u> GAJARSA, in which <u>Circuit Judge</u> NEWMAN joins.

PER CURIAM.

Motion Systems Corp. ("Motion Systems") brought suit against George W. Bush, President of the United States, and Robert B. Zoellick, United States Trade Representative ("Trade Representative"), in the United States Court of International Trade, challenging the President's determination not to grant import relief to the domestic pedestal actuator industry under section 421 of the U.S.-China Relations Act

of 2000, Pub. L. No. 106-286, 114 Stat. 880 (codified at 19 U.S.C. § 2451) ("section 421"). The Court of International Trade granted judgment in favor of the defendants. Motion Systems Corp. v. Bush, 342 F. Supp. 2d 1247 (Ct. Int'l Trade 2004). Motion Systems appealed and for the reasons set forth below, we affirm.

I

Section 421, added to the Trade Act of 1974 by the U.S.-China Relations Act of 2000, establishes procedures under which the President may provide import relief in the form of "increased duties or other such import restrictions" for domestic industries threatened by "market disruption" caused by increased importation of products from China. 19 U.S.C. § 2451(a) (2000).

In accordance with section 421(b)(1), Motion Systems filed a petition with the United States International Trade Commission ("ITC"), alleging that importation of Chinese pedestal actuators had increased rapidly from 2000-2002, resulting in market disruption within the meaning of section 421. At the time, Motions Systems was one of three domestic producers of pedestal actuators, electromechanical devices used principally to raise and lower the seats of mobility scooters and motorized wheelchairs. See Pedestal Actuators from China: Investigation No. TA-421-1, Pub. 3557 (U.S. Int'l Trade Comm'n, Nov. 2002), at 3, 11-16.

Upon receipt of the petition, the ITC promptly investigated "whether products of the People's Republic of China are being imported into the United States in such increased quantities or under such conditions as to cause or threaten to cause market disruption to the domestic producers of like or directly competitive products." 19 U.S.C. § 2451(b)(1). On October 18, 2002, the ITC issued an affirmative finding of market

disruption and transmitted its report and remedial recommendations to the President and the Trade Representative. See 19 U.S.C. § 2451(f)-(g). The ITC recommended that "the President impose a quantitative restriction for a three-year period on imports of the subject pedestal actuators from China," and suggested specific amounts for each year. In accordance with section 421(h)(1), a summary of the ITC's determination and an invitation for public comment was published in the Federal Register. See Notice of Proposed Measure and Opportunity for Public Comment Pursuant to Section 421 of the Trade Act of 1974: Pedestal Actuators from the People's Republic of China, 67 Fed. Reg. 71007-03 (Nov. 27, 2002).

On January 2, 2003, after attempts to negotiate a remedial agreement with China proved unsuccessful, the Trade Representative submitted to the President his recommendations regarding the ITC's determination. However, the President did not provide the requested import relief. Rather, the President concluded that "providing import relief for the U.S. pedestal actuator industry is not in the national economic interest of the United States" because "the import relief would have an adverse impact on the United States economy clearly greater than the benefits of such action." Presidential Determination on Pedestal Actuator Imports from the People's Republic of China, 68 Fed. Reg. 3157 (Jan. 17, 2003). The President found that the ITC's recommended import quota would not likely benefit the domestic pedestal actuator industry, but instead would cause imports to shift to other offshore sources. Moreover, the President found that even if the import quota would provide some benefit to domestic producers of pedestal actuators, this benefit would be substantially outweighed by the increased cost to the downstream purchasers and the ultimate

consumers of pedestal actuators. Motion Systems requested reconsideration of the President's determination, which the President denied.

On April 9, 2003, Motion Systems filed suit against the President and the Trade Representative in the Court of International Trade, challenging the President's denial of import relief and seeking declaratory and injunctive relief. The complaint alleged that the President's denial of relief was beyond his statutory authority under section 421, arguing that the President misconstrued the provisions of section 421 specifying the circumstances in which he may deny import relief and that the relevant facts did not support the conclusion that the import relief would have an adverse impact clearly greater than its benefits. The complaint also alleged that the Trade Representative's actions were in error, arguing that he too misconstrued section 421 and that he did not follow proper procedures in conducting the public hearing on the ITC's findings.

The Court of International Trade granted judgment in favor of the defendants, concluding that the President did not exceed his statutory authority and that the President's action was not invalid because of any defect in the procedures followed by the Trade Representative. Motion Systems, 342 F. Supp. 2d at 1262, 1265.

II

Section 421 defines the role of the President and the Trade Representative in determining whether to provide import relief for market disruption due to importation of products from China. An ITC investigation into market disruption may be initiated upon the request of the President or the Trade Representative, upon resolution of the House Committee on Ways and Means or the Senate Finance Committee, upon petition by a private entity "which is representative of an industry" in accordance with 19 U.S.C.

§ 2252(a), or by the ITC's own motion. 19 U.S.C. § 2451(b)(1). If, after an investigation, the ITC makes an affirmative determination of market disruption, it must propose import relief in the form of an "increase in, or imposition of, any duty or other import restrictions necessary to prevent or remedy the market disruption." 19 U.S.C. § 2451(f). The ITC must submit to the President and the Trade Representative a report containing its determination and recommendations, along with an explanation thereof, and must make that report available to the public. 19 U.S.C. § 2451(g).

After receiving this report, and following a period of public notice and comment, the Trade Representative must make a recommendation to the President concerning what action, if any, to take. 19 U.S.C. § 2451(h). However, the President has discretion to determine whether import relief should be awarded. Under section 421(k)(1), the President must, within fifteen days of receiving the Trade Representative's final recommendation, "provide import relief . . . unless the President determines that provision of such relief is not in the national economic interest of the United States . . . ." 19 U.S.C. § 2451(k)(1). Further, the statute provides that "[t]he President may determine . . . that providing import relief is not in the national economic interest of the United States only if the President finds that the taking of such action would have an adverse impact on the United States economy clearly greater than the benefits of such action." 19 U.S.C. § 2451(k)(2).

III

No right of judicial review exists to challenge the acts of either the President or the Trade Representative in this case. There is no explicit statutory cause of action granting a petitioner who is denied import relief under section 421 the right to sue the

President and the Trade Representative in the Court of International Trade. Thus, Motion Systems has only two potential sources for relief: (1) the Administrative Procedure Act ("APA"), 5 U.S.C. § 701; or (2) some form of nonstatutory review. Motion Systems acknowledges that it cannot challenge the President's actions under the APA because the President is not an "agency." See Franklin v. Massachusetts, 505 U.S. 788, 800-01 (1992). Thus, Motion Systems must resort to some form of nonstatutory review as its only potential source for relief.

As regards Motion Systems' challenge to the President's actions, this case reduces down to a rather simple issue: Can Motion Systems challenge the President's discretionary actions under 19 U.S.C. § 2451 as outside the scope of authority delegated to him by Congress? Dalton v. Specter, 511 U.S. 462 (1994), rejected this alternative and thus leaves Motion Systems with no right to judicial review here. Hence, under Dalton, no complaint can lie against the President on the facts of this case.

In Dalton, the plaintiffs challenged the President's decision to close the Philadelphia Naval Shipyard as a violation of the Defense Base Closure and Realignment Act of 1990. 511 U.S. at 464. In Part I, the Court held that a straightforward application of Franklin removes the APA as a statutory alternative for standing because the President is not an "agency." Id. at 468-70. In Part II, the Court took up the alternative ground relied on by the United States Court of Appeals for the Third Circuit: "[T]hat whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." Id. at 471. In other words, the Third Circuit had held that if the President's actions are outside the scope of authority delegated to him by the 1990 Act, they can be challenged under a

nonstatutory "constitutional" cause of action analogous to Motion Systems' claim in the present case. In Dalton, however, the Court rejected this theory as inconsistent with its precedents.

The Court commented that its precedents "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." Id. at 472. The Court pointed to Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952), as an example of a case properly characterized as involving a "constitutional" challenge. Id. at 473. In that case, the Government disclaimed any statutory authority for the President's seizure of steel mills and invoked the Constitution itself as authority for the Presidential action. Id. ("Because no statutory authority was claimed, the case necessarily turned on whether the Constitution authorized the President's actions."). The Court then explained that, in contrast to Youngstown, Dalton involved a statutory claim: "The President is said to have violated the terms of the 1990 Act by accepting procedurally flawed recommendations." Id. at 474. In other words, the President purportedly acted outside the scope of authority delegated to him by the 1990 Act. The Court did not address the extent of available review of Presidential action for violation of a "statutory mandate," assuming that some such review was available. Id. However, because the Court concluded that the challenged Presidential action was discretionary under the 1990 Act, see id. at 476, the Court held that review was in any event precluded by the longstanding rule that: "[Judicial] review [of Presidential action] is not available when the statute in question commits the decision to the discretion of the President." Id. at 474.

Here, there is no colorable claim that the President exceeded his statutory authority.  Instead, this case presents nearly the same situation as in <u>Dalton</u>: Motion Systems alleges the President violated the terms of section 421 by opting to protect national interests over domestic industry without evidentiary support.  Motion Systems thus accuses the President of acting beyond the scope of authority delegated to him under the statute.  Motion Systems attempts to distinguish <u>Dalton</u> because, in its view, section 421 gives the President only purely ministerial duties.  <u>See</u> <u>Mississippi v. Johnson</u>, 71 U.S. 475, 498 (1866) (leaving open the question of whether the President can be sued to perform a purely ministerial act under a positive law).  To the contrary, section 421 unquestionably grants the President broad discretion to determine "that provision of [import] relief is not in the national economic interest of the United States or . . . that the taking of action . . . would cause serious harm to the national security of the United States."  19 U.S.C. § 2451(k)(1) (2004).

Section 421 thus accords the President the same discretion found to remove Presidential action from judicial review in other Supreme Court cases.  In <u>United States v. George S. Bush & Co., Inc.</u>, 310 U.S. 371 (1940), upon which <u>Dalton</u> expressly relies, 511 U.S. at 476, the Court dealt with subject matter quite similar to that of this case.  The statute at stake in <u>Bush</u> gave the President discretion to increase tariffs, and he had done so.  An importer challenged the President's action.  This court's predecessor, the Court of Customs and Patent Appeals, invalidated the increased tariff.  Notably, the relevant statute in <u>Bush</u>

> provided . . . that the President "shall by proclamation approve the rates of duty and changes in classification and in basis of value specified in any report of the commission under this section, <u>if in his judgment such rates</u>

of duty and changes are shown by such investigation of the commission to be necessary to equalize such differences in costs of production."

Bush, 310 U.S. at 376-77 (emphasis added).  Like section 421, the statute in Bush limited to some degree the President's discretion.  Specifically, the statute in Bush required the President to find that the rates of duty and changes are "necessary to equalize such differences in costs of production" before taking action.  Despite this limit on the President's discretion, the Court held that the Presidential decision was not subject to judicial review:

> The President's method of solving the problem was open to scrutiny neither by the Court of Customs and Patent Appeals nor by us. Whatever may be the scope of appellate jurisdiction conferred by § 501 of the Tariff Act of 1930, it certainly does not permit judicial examination of the judgment of the President that the rates of duty recommended by the Commission are necessary to equalize the differences in the domestic and foreign costs of production.

Id. at 379 (emphasis added).

In Dakota Central Telephone Co. v. State of South Dakota, 250 U.S. 163, 181 (1919), another case upon which Dalton expressly relies, 511 U.S. at 476, the Court dealt with the President's ability to seize control of various communication systems for national security or defense reasons.  Notably, the relevant statute in Dakota provided:

> That the President during the continuance of the present war is authorized and empowered, whenever he shall deem it necessary for the national security or defense, to supervise or to take possession and assume control of any telegraph, telephone, marine cable, or radio system or systems, or any part thereof, and to operate the same in such manner as may be needful or desirable for the duration of the war . . . .

Dakota, 250 U.S. at 181 (quoting 40 Stat. 904 (1918)) (emphasis added).  As in Bush, the statute in Dakota also limited to some degree the President's discretion.  Specifically, the statute required the President to determine that seizure was "necessary for the national security or defense."  Despite this restriction, the Court again concluded

the Presidential action at issue was "beyond the reach of judicial power." Id. at 184. The Court made this determination despite a challenge to the President's action as being unjustifiable at the time the power was exercised. Id. (commenting that the plaintiffs alleged that "there was nothing in the conditions at the time the power was exercised which justified the calling into play of the authority; indeed, the contention goes further and assails the motives which it is asserted induced the exercise of the power"). Thus both Dakota and Bush involved situations where the Court insulated Presidential action from judicial review for abuse of discretion despite the presence of some statutory restrictions on the President's discretion. Similarly, section 421 places some restriction on the President's discretion to grant or deny import relief. But here, there is no colorable claim that the President has violated an explicit statutory mandate. Rather, the issue is whether the President abused his discretion under section 421(k). The President must determine "that provision of [import] relief is not in the national economic interest of the United States or . . . that the taking of action . . . would cause serious harm to the national security of the United States." 19 U.S.C. § 2451(k)(1). However, under Dalton, Bush, and Dakota, the President's actions under section 421 are still sufficiently discretionary to preclude judicial review.

Finally, because the acts of the Trade Representative were not final actions, the Court of International Trade also lacked jurisdiction to review those acts. Instead, the Trade Representative's actions were analogous to those of the Secretary in Franklin, a case in which the Secretary's report was "like a tentative recommendation" or "the ruling of a subordinate official" because it was the President who carried the responsibility of transmitting the final report to Congress. Franklin, 505 U.S. at 798

(internal quotation omitted).  A subordinate officer's actions become reviewable as final only when they carry a direct and immediate consequence.  See Japan Whaling Ass'n v. Am. Cetacean Soc., 478 U.S. 221 (1986) (concluding that the Secretary's certification to the President automatically triggered sanctions and thus was a final action).  In this case, the Trade Representative's actions were not final, but only recommendations for Presidential action, and are thus not reviewable.

IV

On the facts of this case, no complaint can lie against either the President or the Trade Representative.  The President's actions cannot be challenged because judicial review is unavailable when a statute allegedly violated itself commits a decision to the discretion of the President.  The Trade Representative's actions cannot be challenged because they were not final.  We therefore affirm the judgment of the Court of International Trade in favor of both defendants.

AFFIRMED

# United States Court of Appeals for the Federal Circuit

04-1428

MOTION SYSTEMS CORPORATION,

Plaintiff-Appellant,

v.

GEORGE W. BUSH, President of the United States, and
ROBERT B. ZOELLICK, United States Trade Representative,

Defendants-Appellees,

and

CCL INDUSTRIAL MOTOR LTD.,

Defendant-Appellee.

GAJARSA, Circuit Judge, with whom Circuit Judge NEWMAN joins, concurring in part and concurring in the judgment.

The court concludes that the decision not to assess antidumping duties against CCL Industrial Motor Ltd. will stand. I too would sustain that conclusion, but on its merits, not by default. On its merits, this action by the President is within the statutory authority and discretion that Congress assigned to the President; I conclude, therefore, that the action of the President is in accordance with law.

I write separately to express the view that the court is not barred from review of the range of statutory discretion assigned to the President by Congress. On conducting such review, as fully briefed and argued on this appeal, I conclude that the President's decision is within the parameters of the Act of Congress that assigned to the President

the responsibility for the balancing of the economic impact of each instance of dumping.[1]  It is not the judiciary's role to grade how the President conducts such an economic study, for the statute established only the broad parameter that the President must balance the economic effect on the aggrieved domestic industry against the economic benefit of the cheaper foreign import.  However, it is the judiciary's role, and its duty, to review whether the President acted within the statutory parameters.  The court's holding that the President's actions cannot be reviewed on any basis is contrary to the statutory assignment and contrary to the structure of our government.

## I.

The majority correctly notes that because no right of judicial review is available under the APA, "Motion Systems must resort to some form of nonstatutory review as its only potential source of relief."  It then interprets the Supreme Court's decision in Dalton v. Specter to have "rejected" the notion that a litigant could "challenge the President's actions . . . as outside the scope of authority delegated to him by Congress."  But Dalton says no such thing, and the majority's interpretation of it represents an unwarranted expansion of the narrow holding of that case.

The general principle underlying the Supreme Court's opinion in Dalton—that discretionary Presidential actions without constitutional implications are not subject to judicial review—is unexceptionable.  No one has argued that the President's discretionary actions under § 2451 raise constitutional questions.  The question dividing

---

[1]        In accordance with 19 U.S.C. § 2451(k)(1), the President is charged to "provide import relief for such industry pursuant to subsection (a) of this section, unless the President determines that provision of such relief is not in the national economic interest of the United States or, in extraordinary cases, that the taking of action pursuant to subsection (a) of this section would cause serious harm to the national security of the United States."

us is, rather, whether a statute delegating to the President <u>qualified</u> discretion is sufficient to render unreviewable whether the Presidential action is pursuant to the statute, and is within the assigned discretionary authority, such that the President must be dismissed as a defendant without further inquiry. <u>Dalton</u> does not mandate that result.

I note, first, that the majority opinion in <u>Dalton</u> expressly declined to rule on the very proposition for which the majority relies on it: whether nonstatutory review of allegedly <u>ultra vires</u> Presidential action is ever available. The opinion assumed that "some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA." <u>Dalton</u>, 511 U.S. at 474. Justice Blackmun's concurring opinion states strongly, without contravention, that, under the Court's holding, "neither a challenge to ultra vires exercise of the President's statutory authority nor a timely procedural challenge is precluded" from judicial review. <u>Id.</u> at 478 (Blackmun, J., concurring in part and concurring in the judgment).

Second, both the majority and concurring opinions in <u>Dalton</u> rely heavily upon features peculiar to the statute there at issue—notably, the unfettered discretion granted to the President by the statute, which "[did] not at all limit the President's discretion in approving or disapproving the Commission's recommendations." <u>Id.</u> at 476. Section 2451, by contrast, does not grant the President "unqualified" discretion. As the majority concedes, the limitations on the President's discretion in § 2451 make this case less like <u>Dalton</u> and more like <u>United States v. George S. Bush & Co.</u>, in which the Supreme Court stated that the President's actions were subject to review for "conformity with the statute." <u>George S. Bush & Co.</u>, 310 U.S. at 380. It is significant that two of the cases

on which <u>Dalton</u> relies most heavily—<u>George S. Bush & Co.</u> and <u>Chicago & Southern Air Lines v. Waterman S.S. Corp.</u>—both contemplate the availability of judicial review of Presidential actions for "conformity with the statute" or "regularity." <u>Id.</u>; <u>see also</u> <u>Chicago & Southern Air Lines v. Waterman S.S. Corp.</u>, 333 U.S. 103, 105 (1948).

The D.C. Circuit has repeatedly confirmed the availability of such review. In <u>Chamber of Commerce v. Reich</u>, 74 F.3d 1322, 1331 (D.C. Cir. 1996), it explained that "<u>Dalton's</u> holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available." It has since reiterated that principle on several occasions in cases involving suits directly against the President acting in his official capacity under a statute granting him discretion. <u>See, e.g.</u>, <u>Mountain States Legal Found. v. Bush</u>, 306 F.3d 1132, 1136 (D.C. Cir. 2002) (stating that "Courts remain obligated to determine whether statutory restrictions have been violated. In reviewing challenges under the Antiquities Act, the Supreme Court has indicated generally that review is available to ensure that [the President's actions] are consistent with constitutional principles and that the President has not exceeded his statutory authority."); <u>Tulare County v. Bush</u>, 306 F.3d 1138, 1141 (D.C. Cir. 2002) (reviewing whether Presidential proclamation made pursuant to his discretion under the Antiquities Act was within the "statutory standard").

In addition, this court's own precedent offers ample authority for the proposition that trade-related actions of the President taken pursuant to authority delegated by Congress are subject to review to determine whether that action "falls within his delegated authority, whether the statutory language has been properly construed, and

04-1428                                                                 4

whether the President's action conforms with the relevant procedural requirements." Florsheim Shoe Co. v. United States, 744 F.2d 787, 795 (Fed. Cir. 1984); see also Maple Leaf Fish Co. v. United States, 762 F.2d 86, 89 (Fed. Cir. 1985) (concluding that "[f]or a court to interpose" in Presidential decisionmaking, "there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority"); Humane Soc'y v. Clinton, 236 F.3d 1320, 1330 (Fed. Cir. 2001) (concluding that judicial review of discretionary Presidential decision under 16 U.S.C. § 1826a(b)(3)(A) was not available, but considering whether the President "acted in other than good faith" or "otherwise was in violation of his duties" under the statute). See also Sneaker Circus, Inc. v. Carter, 566 F.2d 396, 402 (2d Cir. 1977) (concluding that although judicial review of Presidential trade negotiations was unavailable, the courts had authority to review "the procedures employed by the Executive in concluding these [trade] agreements, procedures which are mandated by statute"); No Oilport! v. Carter, 520 F. Supp. 334, 347 (W.D. Wash. 1981) (stating that "[i]t is clear that this court may review . . . the President's actions to determine whether they complied with the procedural requirements imposed by" the Public Utilities Regulatory Act of 1978).

The majority's assertion that Motion Systems fails to state a colorable claim of ultra vires action is dubious. A "colorable claim" is merely one which is not "frivolous." See, e.g., S. Illinois Carpenters Welfare Fund v. Carpenters, 326 F.3d 919, 923 (7th Cir. 2003) (holding that "a colorable claim is merely one that is not frivolous"); Davis v. Featherstone, 97 F.3d 734, 737-38 (4th Cir. 1996) (holding that "A claim is colorable if it is arguable and nonfrivolous, whether or not it would succeed on the merits."); Harline v. Drug Enforcement Agency, 148 F.3d 1199, 1203 (10th Cir. 1998) (holding that a federal

claim is not colorable only "if it is immaterial, and made solely for the purpose of establishing [federal] jurisdiction or . . . is wholly insubstantial or frivolous"); Boettcher v. Sec'y of Health & Human Servs., 759 F.2d 719, 722 (9th Cir. 1985) (holding that a federal claim is non-colorable only if it is "wholly insubstantial, immaterial, or frivolous"). Here, Motion Systems' complaint was brought against Presidential action taken pursuant to a statute that dictates the scope of the President's authority and the manner of its exercise. The complaint repeatedly describes the President's actions as "ultra vires." It identifies portions of the statute that Motion Systems believes have been violated. To conclude that Motion Systems' claim is non-colorable simply re-defines the notion of colorability to be synonymous with "meritorious." I disagree with the majority's attempt to dispose of the merits without addressing the more difficult jurisdictional question that is necessarily a predicate to such a disposition.

Where, as here, the plaintiff has alleged that the President's actions are "ultra vires," in the sense that the standards for action "imposed by Congress [have] not been met," I read the applicable authorities to permit and indeed to require judicial review of whether or not he acted within the discretionary range of the statutory mandate. I believe Motion Systems has standing to challenge the President's actions for this purpose.

II.

Having determined that standing exists, it is necessary to assess jurisdiction under § 1581(i), which provides that the Court of International Trade shall have exclusive jurisdiction over "any civil action commenced against the United States, its agencies, or its officers" arising out of certain trade and tariff laws. The question is

04-1428                                          6

whether the category of "officer" identified in the statute includes the President, for if it does, review authority is assigned by statute, and is not subject to repulse by the court to which it is assigned.

The phrase "the United States . . . or its officers" naturally calls to mind the constitutional class of "officers of the United States," as that term is used in the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, and the Commission Clause, art. II, § 3. Indeed, in cases involving the applicability of statutory references to "officers" of the United States, the courts have generally held that such references are limited to officials who are subject to the provisions of the Appointments Clause. See, e.g., Steele v. United States, 267 U.S. 505, 507 (1925) (stating that "the words 'officer of the United States,' when employed in the statutes of the United States, [are] to be taken usually to have the limited constitutional meaning' of a person appointed under Appointments-clause procedures."); United States v. Mouat, 124 U.S. 303 (1888).

The question before us here, however, is very different. This case deals not with a Bureau of Prisons doctor (United States v. Germaine, 99 U.S. 508 (1878)), a navy paymaster clerk (Mouat), a customs clerk (United States v. Smith, 124 U.S. 525 (1888)), or a Naval Academy cadet (United States v. Perkins, 116 U.S. 483 (1886)), but with the President of the United States—a constitutional official who is plainly not an "officer of the United States" for Appointments Clause purposes but whose office is created by the Constitution itself. The question before us is whether a person holding a constitutionally recognized position, such as the President or a member of Congress, which is not by its terms subject to the provisions of the Appointments Clause, is nevertheless an officer of the United States for statutory purposes.

04-1428                                   7

The Supreme Court has addressed this question directly, and answered it "yes." In Lamar v. United States, 241 U.S. 103 (1916), the Court considered whether a man impersonating a member of Congress could be charged under a statute making it a crime to "'falsely assume or pretend to be an officer or employee acting under the authority of the United States, or any Department, or any officer of the government thereof.'" Lamar v. United States, 241 U.S. at 111 (quoting statute). The defendant argued that the indictment stated no offense against him, "because a member of the House of Representatives . . . is not an officer acting under authority of the United States" within the meaning of the statute and unspecified "provisions of the Constitution." Id. at 112.

The Supreme Court disagreed, concluding that "the issue here is not a constitutional one, but who is an officer acting under the authority of the United States within the provisions" of the statute at issue. Id. That question, the Court ruled, "must be solved by the text of the provision, not shutting out as an instrument of interpretation proper light which may be afforded by the Constitution." Id.

Lamar stands for the proposition that where the alleged officer is a constitutionally recognized person, rather than merely a minor government official, the simple presumption of Germaine and its progeny—that statutory references to "officers of the United States" include only such officials as fall within the terms of the Appointments Clause—does not apply. The President, as holder of the constitutional office of the Presidency,[2] is more closely analogous to a member of Congress than to a

---

[2]    See, e.g., U.S. Const. art. II, § 1, cl.1 (vesting the executive power in the President, who "shall hold his Office during the Term of four Years"); art. II, § 1, cl.5 (referring to the "Office of President").

04-1428                                    8

minor functionary like the prison doctor in <u>Germaine.</u> The analysis used by the Supreme Court in <u>Lamar</u> is, therefore, the applicable analysis here. That analysis requires simple statutory construction undertaken in light of possible constitutional questions.

The first question before the Court, then, is whether Congress, in enacting 28 U.S.C. § 1581(i), intended the words "the United States . . . or its officers" to include the President. In considering that question the court should consider the issues addressed by the Supreme Court in <u>Lamar</u>: the ordinary meaning of the word "officer"; the existence of other statutory provisions that consider the President to be an officer; and the consistency of such officer status with Supreme Court and other analogous precedent. <u>See</u> <u>Lamar</u>, 241 U.S. at 113. <u>See also</u> <u>Operation Rescue Nat'l v. United States</u>, 975 F.Supp. 92, 103-04 (D. Mass. 1997), <u>aff'd</u>, 147 F.3d 68 (1st Cir. 1998) (applying <u>Lamar</u> analysis to determine whether members of Congress are "employees" of the government for purposes of the immunity provisions of the Federal Tort Claims Act and concluding that they are both "employees" and "officers"). Second, the court must consider whether the inclusion of the President within the class of officers in § 1581(i) runs afoul of constitutional principles.

A.    Statutory Construction

In interpreting a statute, "our inquiry begins with the statutory text, and ends there as well if the text is unambiguous." <u>Bedroc Ltd. v. United States</u>, 541 U.S. 176, 183 (2004) (Rehnquist, C.J., plurality opinion). In construing statutory language, we begin with the "assumption that the ordinary meaning of [Congress'] language accurately expresses the legislative purpose." <u>Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt.</u>

Dist., 541 U.S. 246, 252 (2004). The Supreme Court frequently repairs to dictionary definitions to ascertain the "ordinary meaning" of statutory text that does not arise in a technical context. See id. at 252-53 (using dictionary definition to construe Congress' intent in using the word "standard"); see also Lamar, 241 U.S. at 113 (using dictionary definitions to construe Congress' intent in using the word "officer" and concluding that "officer" included members of Congress). Here, the statute applies to "the United States . . . or its officers." 28 U.S.C. § 1581(i).

With regard to the "common understanding" of the word "officer," as "expressed in the ordinary, as well as legal, dictionaries," Lamar, 241 U.S. at 113, one finds that, "in public affairs," the term "officer" refers to a person "holding office of trust, command, or authority in corporation, government . . . or other institution." Black's Law Dictionary 977 (5th ed. 1979).[3] The magisterial Oxford English Dictionary defines "officer" as, among other things, "a person authoritatively appointed or elected to exercise some function pertaining to public life, or to take part in . . . the management or direction of a public corporation, institution, etc." and "[a] person holding office and taking part in the management or direction of a society or institution, esp. one holding the office of president, treasurer, or secretary; an office-bearer."[4] 10 Oxford English Dictionary 732

---

[3] The same dictionary's definitions of "United States officer" and "officer of the United States," are unhelpful here: they apply to situations as in Germaine, Mouat, and Steele, which, as discussed, are irrelevant to the question of whether a constitutional officer (as opposed to a minor executive branch official) is an "officer of the United States."

[4] See also Webster's New International Dictionary 1567 (1961) ("One who holds an office: one who is appointed or elected to serve in a position of trust, authority, or command esp. as specif. provided by law"); American Heritage Dictionary 1220 (2000) ("One who holds an office of authority or trust in an organization, such as a corporation or government"); The New Oxford American Dictionary 1188 (2001) ("a holder of a public, civil, or ecclesiastical office"; "a holder of a post in a society,

(2d. ed. 1989). Ordinary usage confirms these definitions: the officers of a corporation, for example, typically include its president.

The second factor considered by the Supreme Court in <u>Lamar</u> was the existence of other statutes in which the term "officer" was found to include members of Congress. <u>See</u> <u>Lamar</u>, 241 U.S. at 113. The President of the United States may be an "officer" for some statutory purposes, but not for others. Some statutes by their terms include the President in the class of statutory officers. In the Impoundment Control Act, for example, § 686(a) refers to "the President, the Director of the Office of Management and Budget, the head of any department or agency of the United States, or any <u>other</u> officer or employee of the United States." 2 U.S.C. § 686(a) (emphasis added). The succeeding section empowers the Comptroller General to bring a civil action in district court to force the government to make available necessary budget authority and empowers the district courts to enter an order against "any department, agency, officer or employee of the United States"—a grouping which, read in conjunction with the "or other officer" language of § 686(a), clearly includes the President. <u>See</u> 2 U.S.C. § 687; <u>see also</u> 3 U.S.C. § 303 (defining "function" to include "any duty, power, responsibility, authority, or discretion vested in *the President or other officer* concerned") (emphasis added).

Other statutes appear to recognize that the President is included in the class of officers by negative implication: the federal law proscribing bribery, for example, applies to persons who are "officer[s] or employee[s] . . . of the United States," but expressly carves out the President from that classification, suggesting that in the absence of the

company, or other organization, esp. one who is involved at a senior level of its management").

exception the class would include the President.  See 18 U.S.C. § 203(a)(1)(B), § 202(c).

In addition, the courts have ruled on several occasions that the federal mandamus law, which by its terms applies to "officer[s] and employee[s] of the United States," applies to the President.  See, e.g., Nat'l Treasury Employees Union v. Nixon, 492 F.2d 587, 602, 616 (D.C. Cir. 1974) (concluding that the President is subject to mandamus proceedings under 28 U.S.C. § 1361 but refraining from issuing the writ); Nat'l Wildlife Fed. v. United States, 626 F.2d 917, 923 (D.C. Cir. 1980) (holding that "[m]andamus is not precluded because the federal official at issue is the President of the United States"); Swan v. Clinton, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996) (finding that the "prerequisites for stating a cause of action under the mandamus statute are met" in an action against President Clinton).

The executive branch's own lawyers have concluded on many occasions that the President is a statutory officer of the United States.  In fact, they have done so in this case: government counsel, in the first oral argument conducted in this matter, stated that "the President is an officer of the United States."  Executive branch counsel have also concluded, in a reasoned opinion, that a general statutory reference to "officers" included the President.  Section 603 of Title 18 of the United States Code prohibits any "officer or employee of the United States" from making certain political contributions. The Office of Legal Counsel, relying in part on legislative history,[5] concluded in a published opinion that "the better view, in our judgment, is that the President does, indeed, fall within the terms of" the statute's class of "officers. "  See 3 U.S. Op. Off.

---

[5]    The legislative history of § 1581(i) is silent on the question of who constitutes an "officer" for statutory purposes.

Legal Counsel 31, 39 (1979). The Office of Legal Counsel and other executive branch lawyers have considered the President to be an officer for a variety of statutory and other purposes. See 38 U.S. Op. Atty. Gen. 445 (April 9, 1936) (construing statute applying to "the Secretary of the Treasury or any other officer of the Government" to include the President as such an officer); 20 U.S. Op. Off. Legal Counsel No. 124 (May 7, 1976) (referring to "an officer who is subject to control and removal by an officer other than the President"); 19 U.S. Op. Off. Legal Counsel 93 (June 3, 1986) (referring to "executive officers other than the President"); 6 U.S. Op. Off. Legal Counsel 751 (December 14, 1982) (referring to "Executive officers other than the President"); 21 U.S. Op. Atty. Gen. 494 (February 11, 1897) (referring to the Secretary of the Treasury or "any other officers save the President"); 13 U.S. Op. Atty. Gen. 479 (referring to the inability of "any officer but the President" to remit a criminal sentence); 1 U.S. Op. Atty. Gen. 566 (September 27, 1822) (referring to the President as "the executive officer of the laws of the country").

Similarly, the President has, on many occasions, referred to himself as an officer. See, e.g., Executive Order No. 11827 (Jan. 4, 1975) (referring to advisory committees "created by the President or any other officer of the Executive Branch" under the Federal Advisory Commission Act); Executive Order No. 11609 (July 26, 1976) ("Delegating Certain Functions Vested in the President to Other Officers of the Government"); Executive Order No. 11480 (September 9, 1969) (referring to actions taken "by the President or by any other officer of the Executive Branch"); Executive Order No. 11435 (January 21, 1968) (referring to actions "of the President or of any other officer of the United States"); Executive Order No. 10994 (February 14, 1962)

(referring to prior orders of "the President or . . . any other officer of the Executive Branch"); Executive Order No. 10640 (October 10, 1955) (same); Executive Order No. 10167 (October 11, 1950) (referring to "the President or such other officer as he may designate").

In addition, the Supreme Court has frequently identified the President as an officer, and specifically as "the chief constitutional officer of the United States." Nixon v. Fitzgerald, 457 U.S. 731, 750 (1982); see also Clinton v. Jones, 520 U.S. 681, 699 n.29 (1997) (quoting Fitzgerald); Franklin v. Massachusetts, 505 U.S. 788, 799 (1992) (referring to the President as a "constitutional officer"); Cheney v. U.S. District Court for the District of Columbia, 541 U.S. 913, 916 (2004) (Justice Scalia, writing as a single justice, referring to "the President and other officers of the Executive"); Menard's Heirs v. Massey, 49 U.S. 293, 309 (1850) (referring to "the President or some other officer"); U.S. Ex. Rel. Goodrich v. Guthrie, 58 U.S. 284, 310 (1854) (McLean, J., dissenting) (stating that "the President, like all the other officers of the government, is subject to the law"); Embry v. United States, 100 U.S. 680, 685 (1879) (referring to "[n]o officer except the President"); United States v. MacDonald, 128 U.S. 471, 473 (1888) (quoting Embry); United States v. Am. Bell Tel., 128 U.S. 315, 363 (1888) (referring to "the president . . . or any other officer of the government"); In Re Sealed Case, 121 F.3d 729, 748 (D.C. Cir. 1997) (the President is "the chief constitutional officer" of the United States).

Congress has spoken of the President as an "officer" in other contexts: the Senate report addressing the amendment of the apportionment statute at issue in Franklin v. Massachusetts stated explicitly that the amended statute required participation by the President, rather than by the Secretary of Commerce, "so that this

function may be served by a constitutional officer."  S. Rep. No. 2, 71st Cong., 1st Sess., at 5 (1929) (quoted in <u>Franklin v. Massachusetts</u>, 505 U.S. at 800).

Considered together with the Constitution's express identification of the Presidency as an "office"; the consistency of Supreme Court identification of the President as an officer of the United States; and the plain and commonplace understanding of the term "officer" to include public officials like the President, these examples leave no doubt that the President is an officer of the United States.  The next question is whether Congress included the President in the class of "officers" defined by 28 U.S.C. § 1581(i).  I conclude that it did.

Section 1581(i) creates jurisdiction over civil actions against "the United States, its agencies, or its officers," arising out of "any law of the United States providing for—

(1)     revenue from imports or tonnage;
(2)     tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;
(3)     embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or
(4)     administration and enforcement with respect to the matters referred to in paragraphs (1)—(3) of this subsection and subsections (a)—(h) of this section.

28 U.S.C. § 1581(i).  Section 1581(i) is a "broad jurisdictional grant," enacted by Congress as a "residual" source of jurisdiction to supplement the more specific provisions of § 1581(a)—(h) and "eliminate the confusion which currently exists between the jurisdiction of the district courts and the Court of International Trade," and clarify that "all of the suits of the type specified [in § 1581(i)] are properly commenced only in the Court of International Trade."  H.R. Rep. No. 1235, 96th Cong., 2d. Sess. 47 (1980).  The "type specified" in § 1581(i) is lawsuits arising out of a broad array of trade

laws in which the President, acting on authority delegated by Congress, plays an unusually significant role.

Section 1581(i)(3), for example, applies to actions arising out of "embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety." 28 U.S.C. § 1581(i)(3). Embargoes are an element of international affairs in which the President plays a signature, and even dominant, role. See, e.g., 22 U.S.C. § 6032(c) (ordering the President to "instruct the Secretary of the Treasury and the Attorney General to enforce fully the Cuban Assets Control Regulations"); 50 U.S.C. § 1707(b) (requiring the President, within 20 days after the start of hostilities with a foreign nation, to "submit to Congress a report setting forth . . . the specific steps the United States has taken . . . to establish a multinational economic embargo"); 22 U.S.C. § 408 (authorizing the President to "employ such part of the land or naval forces of the United States as he may deem necessary to carry out the purposes of" provisions regulating trade with hostile nations); 22 U.S.C. § 2370 (authorizing the President to "establish and maintain a total embargo upon all trade between the United States and Cuba"). More important, perhaps, is the statute's exclusion from its jurisdictional grant of precisely the kinds of embargoes in which the President plays no role. By excluding from jurisdiction suits arising out of embargoes imposed "for the protection of the public health and safety," the statute excludes most existing embargoes, including, for example, those relating to adulterated foods and unapproved drugs (see 21 U.S.C. § 381), nonconforming products (see 15 U.S.C. § 1192), and toxic substances (see 15 U.S.C. § 2612). The provisions of § 1581(i)(3), in short, are heavily focused on precisely those areas of trade law in which the President

04-1428                                16

is assigned a role. The same is true for § 1581(i)(2), which applies to actions arising out of "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." 28 U.S.C. § 1581(i)(2). The President plays little, if any, role in the revenue-raising portions of the tariff laws, but is assigned a substantial role in the use of tariffs for other purposes. See, e.g., 19 U.S.C. § 2461 (authorizing the President to provide duty-free treatment from certain developing countries, taking "due regard for" considerations such as "the effect such action will have on furthering the economic development of developing countries").

The legislative history of § 1581(i), although not dispositive of this issue, suggests that Congress did not exclude this aspect of the trade laws from the general compass of the Court of International Trade. In the Senate hearings regarding S. 2857—a predecessor to the bill that became the Customs Courts Act of 1980—Assistant Attorney General Babcock, discussing the jurisdictional confusion that S. 2857, and later § 1581, were designed to remedy, cited Sneaker Circus, Inc. v. Carter, 566 F.2d 396 (2d Cir. 1977) as an example of the kind of case that should be heard by the then-named Customs Court. Asked whether the proposed legislation would grant the Customs Court jurisdiction to hear Sneaker Circus' suit against the President, Babcock replied that "that is the object, the real object of the bill. The real object is that that case would very clearly be headed for the Customs Court." Senate Hearings on S. 2857, June 23 and 27, 1978, 95th Cong., 2d. Sess., at 65-66. The House Report on the Customs Courts Act also referred specifically to Sneaker Circus— which was heard by the Second Circuit—as an example of the jurisdictional "confusion" that § 1581(i) was intended to remedy. The legislative history suggests that Congress

was aware of, and approved of, the possibility that what is now the Court of International Trade could exercise jurisdiction over suits under the trade laws, not excluding those actions performed by the President and other officers of the United States.

I conclude, therefore, that Congress intended § 1581(i)'s reference to "officers" to include the President of the United States, subject to constitutional implications, to which I now turn.  See Lamar, 241 U.S. at 112 (concluding that although "the issue here is not a constitutional one," it must be considered in the "proper light . . . afforded by the Constitution").

### B.    Constitutional Considerations

To address the issues presented by this appeal, the court need not reach the overall implications of whether the President is or is not an "officer of the United States" for constitutional purposes.[6]   It need only consider whether the designation of the President of the United States as an officer of the United States in administration of the trade statute raises intractable constitutional difficulties.  I conclude that it does not.

---

[6]    There has been lively academic debate on that issue, mostly as an offshoot of discussions of legislative succession.  Akhil Amar and Vikram Amar conclude that the President is an "Officer of the United States" for constitutional purposes.  See Akhil Reed Amar and Vikram David Amar, Is the Presidential Succession Law Constitutional?, 48 Stan. L. Rev. 113, 136 n.143 (1995) ("If an acting President, wielding the full and awesome executive power of the United States, is not an 'Officer of the United States,' what is he?")  Steven Calabresi agrees.  See Steven G. Calabresi, The Political Question of Presidential Succession, 48 Stan. L. Rev. 155, 158 n.24 (1995) ("The best reading . . . is that the President and the Vice President are the 'Officers of the United States' contemplated by the language in the Appointments Clause referring to "all other Officers of the United States, whose Appointments are not herein otherwise provided for.")  John Manning disagrees.  See John F. Manning, Not Proved: Some Lingering Questions About Legislative Succession to the Presidency, 48 Stan. L. Rev. 141, 146 (1995) (questioning whether one who "holds" the office of the Presidency is therefore an "officer of the United States.").

The Constitution repeatedly designates the Presidency as an "Office, " which surely suggests that its occupant is, by definition, an "officer."[7]  See, e.g., U.S. Const. art. I, § 3, cl. 5; art. II, § 1, cl. 1; art. II, § 1, cl. 5; art. II, § 1, cl. 6; art. II, § 1, cl. 8; amend. XXII, § 1; amend. XXV, §§ 1, 3, 4.  An interpretation of the Constitution in which the holder of an "office" is not an "officer" seems, at best, strained.  It is true, however, that our understanding of the category of "officers of the United States" comes primarily from the Appointments Clause and the jurisprudence associated with it.[8]  The Appointments Clause and the Commissions Clause, by their terms, apply to all "officers of the United States" and all "civil officers of the United States," respectively.  See id. at art. II, § 2, cl. 2; art. II, § 3; art. II, § 4.  Those clauses, and other constitutional provisions,[9] contemplate a class of "officers" inferior in status to the President, who nominates and commissions them.  The key features of that class are nomination by the President, appointment with the advice and consent of the Senate, commission by the President, and removal by impeachment.  It is plain that the President is not an "officer of the

---

[7]     If this is not sufficiently obvious on its face, see, e.g., 10 Oxford English Dictionary 732 (2d. ed. 1989), defining "officer" as "one who holds an office."

[8]     The full text of the Appointments Clause reads:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

Art. II, § 2, cl.2.

[9]     See, e.g., the Oath of Office Clause, art. VI, cl.3 (requiring an oath of office for, inter alia, "all executive and judicial officers").  The President's oath of office is separately required by Article II, Section 2, clause 8, suggesting that he is not among the "executive officers" governed by Article VI, clause 3.

United States" for Appointments Clause, Commission Clause, or Oath of Office Clause purposes.[10]

The question then remains whether the inapplicability of those clauses to the President creates a constitutional barrier to his inclusion as an "officer" for purposes of § 1581(i). I conclude that it does not, for two reasons. First, although the Appointments Clause and its relations do contemplate a class of "Officers of the United States" that is inferior to and does not include the President, there is reason to believe that the inferior class of appointed officials denominated as "Officers of the United States" is nonexclusive. That is, the Constitution suggests that high elected officials—including the President and members of Congress—are officers for constitutional or statutory purposes despite their separate status from persons governed by the Appointments Clause. Second, the constitutional principles and values that underlie the Appointments Clause and the limitations it places upon the officials to whom it applies are not

---

[10] The Impeachment Clause presents a slightly different case. That clause provides for impeachment of "The President, Vice-President and all civil officers of the United States. " U.S. Const. art. II, § 4. This is ambiguous on its face: depending on which canon of construction one prefers, it might mean that impeachment applies to all civil officers of the United States and also to the President and Vice-President, who are not such officers; or it might mean that that the President and Vice-President are examples of the category of civil officers of the United States. It could be read, in other words, to support two contradictory interpretations of the President's status as officer. No less a constitutional authority than Justice Story appears to have held contradictory views about whether the President and Vice-President are "civil officers". In one passage of his Commentaries, for example, he argued that the Impeachment Clause "does not even consider [the President and Vice President] officers of the United States," because "[i]t says, 'the president, vice-president, and all civil officers (not all other civil officers) shall be removed . . . . The language of the clause, therefore, would rather lead to the conclusion that they were enumerated as contradistinguished from, rather than as included in, the description of civil officers of the United States.'" Joseph Story, Commentaries on the Constitution of the United States 2, § 791 (1833). Only a few pages before, however, Story described the remedy of impeachment as being "strictly confined *to civil officers of the United States, including the President and Vice-President*." Id. at § 787 (emphasis added).

threatened by the identification of the President as an "officer" for purposes of section 1581(i).

The Incompatibility Clause, Art. I, § 6, cl. 2, for example, makes clear that members of Congress cannot hold appointed office under the United States, but the courts have consistently concluded that members of Congress are "officers of the United States" for purposes of various federal statutes. See, e.g., Lamar, 241 U.S. 103; Operation Rescue Nat'l v. United States, 975 F.Supp. at 103-04 (holding that a member of Congress is an officer of the United States for purposes of 28 U.S.C. § 2671); Maddox v. Williams, 855 F.Supp. 406 (D.D.C. 1994), aff'd, 62 F.3d 408 (D.C. Cir. 1995) (holding that a member of Congress is an officer of the United States for purposes of 28 U.S.C. § 1442(a)); Williams v. Brooks, 945 F.2d 1322, 1324 n.2 (5th Cir. 1991) (same); Richards v. Harper, 864 F.2d 85, 86 (9th Cir. 1988) (same); Hill Parents Ass'n v. Giaimo, 287 F.Supp. 98, 99 (D. Conn. 1968) (same); Preston v. Edmondson, 263 F.Supp. 370, 372 (N.D. Okla. 1967) (same).

The Senate itself has concluded that Senators are not "officers of the United States"[11] for purposes of the Impeachment Clause,[12] but do hold a "civil office" in the government of the United States for purposes of an oath-of-office statute.[13]

---

[11] Note also that the statute at issue in the oath-of-office debate applied to persons holding "offices" under the United States government, but specifically excepted the President of the United States—suggesting the understanding that without such an exception the President would have been subject to the statute.

[12] This principle has been accepted since 1799, when the Senate, presented with articles of impeachment against Senator William Blount, concluded after four days of debate that a Senator was not a "civil officer of the United States" for purposes of the Impeachment Clause. See Senate J., 5th Cong., 3d Sess., 17 December 1798 – 10 January 1799.

[13] See Cong. Globe, 28th Cong., 1st Sess., 26 January 1864 (floor debate regarding whether legislation requiring an oath of office for "every person elected or

04-1428                                    21

In addition, consideration of the constitutional principles embodied in the Appointments Clause and the limitations it places on "Officers of the United States" leads us to conclude that those principles are unthreatened by the identification of the President as an officer for statutory purposes. The constitutional clauses governing "officers" serve to ensure that the responsible agents of government are subject to defined constitutional controls—primarily nomination, appointment, consent, and impeachment. These requirements exist to effect two core constitutional principles: political accountability and separation of powers. See, e.g., Edmond v. United States, 520 U.S. 651, 660 (1997) (stating that "the Appointments Clause was designed to ensure public accountability"); see also Weiss v. United States, 510 U.S. 163, 186 (1994) (Souter, J., concurring in the judgment) (stating that "the Appointments Clause separates the Government's power but also provides for a degree of intermingling, all to ensure accountability"); Freytag v. Comm'r, 501 U.S. 868, 878-80 (1991) (emphasizing the separation-of-powers principles "embedded in the Appointments Clause," which are "structural and political" and articulate "a limiting principle" for both the executive and Congress).

---

appointed to any office of honor or profit under the Government of the United States, either in the civil, military, or naval departments of the public service" applied to Senators). Despite bitter opposition, proponents of the view that a Senate seat is a civil office of the United States prevailed by a vote of 28-11. The arguments made by the prevailing Senators anticipated, with remarkable precision, the Supreme Court's analysis in Lamar fifty years later: Senator Sumner of Massachusetts, for example, arguing successfully for the position that Senators did hold "offices" for purposes of the statute, noted that the constitutional definition of "officers of the United States" was not controlling, and pointed to the common understanding of the word "officer, " dictionary definitions of same, and other constitutions and statutes that assumed the officer status of legislators. Cf. Lamar, 241 U.S. at 112-13.

To the extent that the qualifications demanded of "Officers of the United States" are rooted in the need to provide political accountability to officials exercising significant government authority, there is clearly no harm in identifying the President—the most politically accountable of all national figures—as such an officer. To the extent that those qualifications are based upon separation of powers principles, those considerations arise not in the identification of the President as an officer of the United States, but in the substance of what Congress is attempting to achieve by that identification. It is difficult to understand, in the context of section 1581, how the mere exercise of jurisdiction over the President threatens the separation of powers. In this regard it is sufficient to note that the President's duties under the Trade Act were delegated by Congress. There is no doubt that, to the extent Congress chose to grant the President discretion in exercising those duties, the exercise of his discretion within the statutory assignment is not subject to judicial review. Whether the courts may exercise jurisdiction over the President—in order, for example, to review whether the President acted "in full conformity with the statute," as permitted in the trade context by the Supreme Court's decision in George S. Bush & Co.—is a wholly different question, and one that does not significantly implicate the separation of powers.

There remains one issue that merits discussion. The Supreme Court, in Franklin v. Massachusetts, has held that the President is not an "agency" subject to suit under the Administrative Procedure Act. In Franklin, the Court declared, "[o]ut of respect for the separation of powers and the unique constitutional status of the President," that it would not subject the President to a statutory provision without an "express statement

by Congress" that the provision was meant to include the President. <u>Franklin v. Massachusetts</u>, 505 U.S. at 800-01.

<u>Franklin</u> is readily distinguishable from the present case. First, as a matter of plain meaning, the President is an unlikely candidate for "agency" status. The common-sense answer to the question, "Is the President an 'agency'?" seems to be "clearly not." The common-sense answer to the question, "Is the President an 'officer of the United States'?" is clearly "yes." Indeed, the government's own counsel, at oral argument, answered that question affirmatively. Second, by its own terms, Franklin applies only to a statutory provision that would make the President's "performance of his statutory duties" reviewable for "abuse of discretion." <u>Id.</u> at 801. It says nothing about the less troubling circumstance in which the President's actions are reviewed only for conformity with the statutory grant.

In addition, there is no suggestion in <u>Franklin</u> that there is any significant historical support for the notion that the term "agency" includes the President. There is, however, massive historical support—in the Constitution itself, in two centuries of Supreme Court jurisprudence, in significant opinions of the lower courts, in federal statutes, and in myriad other sources—for the proposition that the President is an "officer" of his country. The use of the word "officer" in § 1581(i)—a statute that creates jurisdiction over matters of international trade in which the President exercises significant delegated authority—is an "express statement" that the President is subject to jurisdiction under that statute. In this connection, I note that <u>Franklin</u> itself expressly refers to the President as a "constitutional officer." <u>Id.</u> at 799.

04-1428                                     24

Finally, I note that whereas the identification of the President as an "agency" for APA purposes would potentially expose the President to litigation on innumerable causes of action, the identification of the President as an officer for purposes of § 1581(i) would subject him to jurisdiction only in the limited context of actions arising out of specified areas of trade law—an area in which the President has traditionally been subject to jurisdiction. See, e.g., George S. Bush & Co.; Florsheim Shoe Co. v. United States, 744 F.2d at 795; Maple Leaf Fish Co., 762 F.2d at 89. In short, the case at bar presents very different issues than those faced by the Supreme Court in Franklin.

I conclude, therefore, that the phrase "the United States . . . or its officers" in the statute encompasses the President of the United States. Motion Systems therefore has a right to judicial review of the President's actions, and the Court of International Trade properly exercised jurisdiction over that action.

III.

Having concluded that this action was properly before the Court of International Trade, it is necessary to consider the merits of that court's decision. The President is charged by statute to balance the economic impact on the American manufacturer who is injured by competition with "dumped" foreign goods, against the benefit to the importer and potentially to the consumer of lower foreign prices. Such an economic analysis involves the responsibilities and interests of government, industry, labor, and the consumer, and the balancing thereof was quite reasonably assigned by Congress to the topmost official of the executive branch. However, this assignment did not remove trade law from its constitutional design: the assignment was made by the legislative arm, which is responsible for trade and customs law; it is administered by the executive

04-1428                                    25

arm, as for most laws; and challenge to the law or its administration, when raised by "case or controversy," is the responsibility and authority of the judicial arm. I agree with the conclusion of the Court of International Trade that there is "no basis to conclude that the President's decision is based on a 'clear misunderstanding of the governing statute' or that it constituted 'action outside his delegated authority.'" I would affirm its decision on the merits.

CONCLUSION

We granted this rehearing en banc to consider several significant questions of law. The majority has avoided most of these issues in favor of the dubious proposition, never advanced by any party to this action, that Motion Systems has no right to any judicial review of Presidential action taken pursuant to the statute. In order to avoid the very issues we took this case en banc to resolve, the majority misreads and misapplies applicable Supreme Court authority and, in so doing, adopts an indefensibly cramped view of the judiciary's constitutional role as a check and balance to its coordinate and co-equal branches of government.

When Congress has delegated its constitutional authority to the President, and the statute contemplates presidential action within statutory parameters, the courts must determine whether these parameters were respected. The judicial role is to review whether the presidential action is in performance of the statutory assignment, and the extent of executive discretion in that performance. No court, until today, has held that all inquiry is foreclosed as to whether the action complained of is within the statutory assignment and the discretionary authority assigned by Congress. I respectfully object

to the majority's unwarranted disruption of the constitutional balance under which we all serve.