# United States Court of Appeals for the Federal Circuit

---

**MICHAEL SIMON DESIGN, INC., TRU 8, INC. (DOING BUSINESS AS ARRIVISTE), AND TARGET STORES, A DIVISION OF TARGET CORPORATION,**
*Plaintiffs-Appellants,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2009-1571

---

Appeal from the United States Court of International Trade in consolidated case no. 09-00016, Judge Judith M. Barzilay.

---

Decided: June 18, 2010

---

ALAN GOGGINS, Barnes, Richardson & Colburn, of New York, New York, argued for plaintiffs-appellants. With him on the brief was ERIC W. LANDER.

MIKKI COTTET, Senior Trial Attorney, International Trade Field Office, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were TONY WEST, Assistant Attorney

General, JEANNE E. DAVIDSON, Director, and PATRICIA M. MCCARTHY, Assistant Director.   Of counsel on the brief were JAMES M. LYONS, ANDREA C. CASSON, and KARK S. VON SHRILTZ, Office of the General Counsel, United States International Trade Commission of Washington, DC; and YELENA SLEPAK, Office of the Assistant Chief Counsel, United States Customs and Border Protection, Department of Homeland Security, of New York, New York.

———————

Before BRYSON, GAJARSA, and MOORE, *Circuit Judges*.

BRYSON, *Circuit Judge*.

The appellants, three importers of foreign-made goods, filed actions in the Court of International Trade challenging certain modifications to the U.S. tariff schedule made by Presidential proclamation.   The Court of International Trade denied the appellants' request for judicial review of the modifications.  We affirm.

I

The Harmonized Tariff Schedule of the United States ("HTSUS") is the United States' implementation of the 1983 International Convention on the Harmonized Commodity Description and Coding System ("the Convention"), which created a single international system of nomenclature to classify goods for customs purposes.  As periodic changes are made to the international harmonized tariff system, the HTSUS is correspondingly modified pursuant to a statutory scheme established by the Omnibus Trade and Competitiveness Act of 1988.  Under that system, the President may modify the HTSUS by proclamation, based on recommendations made by the

International Trade Commission.  Specifically, 19 U.S.C. § 3006(a) provides as follows:

> The President may proclaim modifications, based on the recommendations by the Commission under section 3005 of this title, to the Harmonized Tariff Schedule if the President determines that the modifications—
>
> > (1) are in conformity with United States obligations under the Convention; and
> >
> > (2) do not run counter to the national economic interest of the United States.

The Commission assists the President by keeping the HTSUS under "continuous review" and by recommending to the President such changes as the Commission considers "necessary or appropriate" to comport with the United States' obligations under the Convention.  19 U.S.C. § 3005(a).  In formulating its recommendations, the Commission institutes a formal investigation, solicits the views of interested federal agencies and the public, and ultimately issues a final report to the President.  *Id.* § 3005(b), (c).  As a general matter, the Commission may not recommend a modification to the HTSUS unless the change is consistent with the international harmonized system under the Convention, is "consistent with sound nomenclature principles," and "ensures substantial rate neutrality."  *Id.* § 3005(d)(1)(A)-(C).  However, the Commission may recommend a rate change if the proposed change is "consequent to, or necessitated by, nomenclature modifications that are recommended under [section 3005]."  *Id.* § 3005(d)(2).

In June 2004, the World Customs Organization proposed several amendments to the international harmonized system, including changes to Chapter 95, which covers "[t]oys, games and sports equipment; parts and accessories thereof." Of particular relevance here, the addition of Note 1(v) to Chapter 95 excluded apparel and other similar "articles having a utilitarian function" from duty-free classification under Chapter 95. In September 2004, the Commission instituted Investigation No. 1205-6 and invited public comment on its recommended corresponding amendments to the HTSUS.

Although the appellants did not submit any comments to the Commission in conjunction with Investigation No. 1205-6, two entities provided commentary regarding Note 1(v) to Chapter 95. Those comments argued that Note 1(v) conflicted with recent decisions of this court holding that certain utilitarian articles are entitled to duty-free classification as "festive articles." In response, the Commission proposed the creation of two subheadings to maintain substantial rate neutrality for two categories of festive articles: (1) "utilitarian articles of a kind used in the home in the performance of specific religious or cultural ritual celebrations for religious or cultural holidays" and (2) "utilitarian articles in the form of a three-dimensional representation of a symbol or motif clearly associated with a specific holiday in the United States." Those duty-free carve-outs did not encompass festive apparel of the type imported by the appellants.

In April 2006, the Commission issued its final report to the President. Among its recommendations, the report included the addition of Note 1(v) and the subheadings for festive articles. Following the required 60-day legislative "lay-over period," the President issued Proclamation 8097 adopting all of the Commission's recommended modifica-

tions to the HTSUS.  Proclamation No. 8097, 72 Fed. Reg. 453 (Jan. 4, 2007).  Those modifications became effective on February 3, 2007.

The appellants filed separate but substantially identical complaints in the Court of International Trade challenging the modifications to the HTSUS.  Invoking the Administrative Procedure Act ("APA"), the appellants alleged that they had been "adversely affected or aggrieved by the ITC's decision to implement" the 2007 HTSUS modifications, and that the modifications were implemented in violation of law.  They asserted that the trial court had jurisdiction to entertain the action pursuant to 28 U.S.C. § 1581(i) and that it should order that "the ITC's amendments to HTSUS Chapter 95 Note 1(v) and subheading 9817.95.05 are not in accordance with law as they violated 19 U.S.C. § 3005."

The court consolidated the cases and then dismissed the consolidated action.  The court noted that when a party invokes the general-review provisions of the APA, and no other statute provides a cause of action, the contested agency action must be "final" in order to be subject to judicial review.  The final action in this case, the court concluded, was the President's proclamation adopting the proposed HTSUS modifications, not the Commission's recommendation.  The court explained that under 19 U.S.C. § 3005 the Commission plays only an advisory role by preparing recommendations that the President is free under 19 U.S.C. § 3006 to accept or reject.  Because the Commission's actions are not final, the court held, they are not subject to APA review.  The court also held that the President's proclamation was unreviewable under the APA, because the President is not an "agency," and thus his actions do not constitute "agency action" within the meaning of the APA.  Moreover, the court noted that

because the President acts at his "complete discretion" in deciding whether to adopt the Commission's recommended modifications under 19 U.S.C. § 3006, and because the Commission's recommendations "carry no direct consequences," the court lacked authority to review the lawfulness of the agency's recommendations to the President. Following the order of dismissal, the appellants took this appeal.

## II

The appellants argue that the Court of International Trade erred by dismissing their actions. Although their January 2009 complaints do not mention the President, and instead challenge only what the appellants characterize as "the ITC's decision to implement" the 2007 HTSUS modifications, the appellants' contentions on appeal focus on the President's role under 19 U.S.C. § 3006(a). The appellants primarily challenge the trial court's conclusion that section 3006(a) gives the President "complete discretion" to accept or reject the Commission's proposed modifications to the HTSUS. To the contrary, the appellants argue, when the Commission's recommended modifications violate the requirement in section 3005 to ensure substantial rate neutrality, the President has no discretion to modify the HTSUS on the basis of such "unlawful" recommendations. The Commission's recommendations, according to the appellants, subjected certain "festive" articles to import duties in contravention of previous court decisions according those articles duty-free status. Because the Commission's recommendations violated section 3005, the appellants argue, the President was not free to adopt those proposed amendments by proclamation.

The APA, which the appellants invoked as the basis for their claim, authorizes suit by a party who is "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. When, as here, agency action is not "made reviewable by statute," the agency action in question must be "final" in order to be subject to judicial review under the APA. *Id.* § 704; *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 61-62 (2004). Because the acts that the appellants complain of are either non-final or not agency actions, and because judicial review is precluded even outside the APA framework due to the discretionary nature of the President's authority under section 3006(a), we affirm the trial court's dismissal of the appellants' actions.

A

To the extent the appellants challenge the Commission's act of recommending modifications to the HTSUS, judicial review is unavailable because the Commission's actions are not "final" for purposes of the APA. *See Dalton v. Specter*, 511 U.S. 462, 469-70 (1994); *Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992). In *Dalton*, the plaintiffs sought to prevent the closing of the Philadelphia Naval Shipyard by challenging recommendations presented to the President by the Secretary of Defense and an eight-member Commission under the Defense Base Closure and Realignment Act of 1990. The Supreme Court observed that, because the President's approval was required to close the bases under the 1990 Act, the recommendations of the Secretary and the Commission carried "no direct consequences" for base closings and served "more like a tentative recommendation than a final and binding determination." *Dalton*, 511 U.S. at 469-70, quoting *Franklin*, 505 U.S. at 798. For that reason, the Court held that the reports were not "final" for

APA purposes and therefore were not subject to judicial review. *Dalton*, 511 U.S. at 469-70; *see also Franklin*, 505 U.S. at 798-99 (census report, prepared by the Secretary of Commerce to advise the President in apportioning congressional seats, did not constitute "final" agency action subject to APA review because the President reviewed and revised the report, made final apportionment calculations, and then transmitted the report to Congress).

Similarly, under the Omnibus Trade and Competitiveness Act of 1988, it is the President's proclamation—not the Commission's recommendations—that effects the amendments to the HTSUS. Under 19 U.S.C. § 3006(a), the President reviews the Commission's proposed modifications, assesses their conformity with the Convention and their impact on the nation's economic interests, and determines whether to adopt them. The Commission's actions, like those of the Secretary and the Base Closing Commission in *Dalton*, serve as non-final recommendations that do not directly affect tariffs or bind importers. As a result, they are not judicially reviewable under the APA.

The appellants contend that the Commission's recommendations are "final" under the Supreme Court's decision in *Bennett v. Spear*, 520 U.S. 154 (1997), because the proposed modifications have the legal effect of overturning this court's precedents regarding classification of festive articles. That argument, however, misconstrues *Bennett* and ignores the critical role of the President in effecting modifications to the HTSUS.

In *Bennett*, the issue was whether the APA authorized a district court to review a Biological Opinion of the Fish and Wildlife Service advising the Bureau of Reclamation

about how a proposed action would affect endangered species or habitats. Because the Bureau was authorized to take action only if it complied with the terms and conditions of the Biological Opinion, the Opinion "alter[ed] the legal regime to which the [Bureau] [wa]s subject." *Id.* at 178. The Court therefore held that the Biological Opinion was "final" and reviewable under the APA, explaining that: "Unlike the reports in *Franklin* and *Dalton*, which were purely advisory and in no way affected the legal rights of the relevant actors, the Biological Opinion at issue here has direct and appreciable legal consequences." *Id.*

In this case, the Commission's recommendations did not alter the legal regime to which the decisionmaker was subject, nor did they have any binding legal effect on the relevant actors. Unlike the Biological Opinion in *Bennett*, the Commission's report under 19 U.S.C. § 3005 is purely advisory. It does not contain terms or conditions that circumscribe the President's authority to act; it does not limit the President's potential responses; and it does not directly modify the HTSUS. Under 19 U.S.C. § 3006(a), the President is not bound in any respect by the Commission's recommendations, so those recommendations have no legal impact on the President's exercise of discretion. Because the President's discretionary action is required to effect modifications to the HTSUS under section 3006, the Commission's report cannot directly impact legal rights or alter any legal regime in the sense described in *Bennett*. Therefore, we hold that the Commission's recommendations under section 3005 are not "final" and consequently are not subject to judicial review under the APA.

B

To the extent the appellants challenge the President's act of proclaiming modifications to the HTSUS, judicial review of that act is also unavailable. As the Supreme Court has held, "the President's actions [are] not reviewable under the APA, because the President is not an 'agency' within the meaning of the APA." *Dalton*, 511 U.S. at 469-70; *see also Franklin*, 505 U.S. at 801 ("As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements."). The appellants do not contend that the President qualifies as an "agency" for purposes of APA review; in fact, they appear to concede that APA review of the President's actions is barred in the present case. The appellants argue, however, that judicial review is appropriate outside the APA because the President's actions in adopting the 2007 HTSUS modifications exceeded his statutorily defined authority.[1] We disagree.

---

[1] To the extent that the appellants suggest that 28 U.S.C. § 1581(i) creates a cause of action independent of the APA, this court has rejected that argument. *See Norcal/Crosetti Foods, Inc. v. United States*, 963 F.2d 356, 359 (Fed. Cir. 1992) ("Subsection 1581(i) is a 'catch-all' provision, allowing the trial court to take jurisdiction over designated causes of action founded on other provisions of law."); *Nat'l Corn Growers Ass'n v. Baker*, 840 F.2d 1547, 1557 (Fed. Cir. 1988); *see also* H.R. No. 96-1235, at 47 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 3729, 3759 ("Subsection (i) is . . . not [intended] to create any new causes of action not founded on other provisions of law."). The appellants rely on cases holding that section 1581(i) gives the Court of International Trade jurisdiction over particular statutory and constitutional claims. In each of those cases, however, the plaintiff plainly had a cause of action; the only question was whether section 1581(i) authorized the action to be

The Supreme Court in *Dalton* assumed, for the sake of argument, that "some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA." 511 U.S. at 474. As the Court in *Dalton* further explained, however, "longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President." *Id.* In the present case, the decision whether to accept or reject the Commission's recommended HTSUS modifications is committed to the discretion of the President under 19 U.S.C. § 3006(a). The language of section 3006 does not implicitly or explicitly limit the President's discretion in a way that would render the President's actions in this case judicially reviewable for exceeding his authority.

In *Dalton*, the statute at issue required the President, within two weeks of receiving a report from the Base Closure Commission, to decide whether to approve the Commission's recommendations in their entirety. If the President approved the recommendations, he was to submit a report to Congress reflecting his decision; if the President disapproved, the recommendations were to be returned to the Commission for revision. 511 U.S. at 465. Because the 1990 Act did not limit the President's discretion to approve or disapprove the recommendations, the Supreme Court held that the President's decision was not subject to judicial review. *Id.* at 476.

The appellants contend that the present case is distinguishable from *Dalton* because the statute at issue in *Dalton* did not limit the President's discretion in any way.

brought in the Court of International Trade and without going through the protest procedure that is a prerequisite for judicial review under 28 U.S.C. § 1581(a).

In contrast, the appellants assert, the language of section 3006 providing that "[t]he President may proclaim modifications, based on the recommendations by the Commission under section 3005 of this title" limits the President's discretion. Their argument is that the President is free to act only if the Commission's recommendations are made "under" section 3005, and that the term "under" must be interpreted to mean "in accordance with." Therefore, they argue, the President has no discretion to implement a Commission recommendation if the recommendation does not comply with section 3005, such as by violating the "substantial rate neutrality" requirement of 19 U.S.C. § 3005(d)(1)(C).

That argument reads far too much into the word "under." A recommendation does not cease to be made "under" section 3005 simply because the recommendation is assertedly contrary to the substantive requirements of that provision. Congress frequently provides for review of a decision made "under" a statute; in such cases, it would be nonsensical to say that the jurisdiction of the reviewing body is limited to instances in which the underlying decision construes and applies the statute correctly. *See, e.g.*, 28 U.S.C. § 1295(6), (7), (8) (authorizing this court to review decisions of the International Trade Commission made "under section 337 of the Tariff Act of 1930"; findings of the Secretary of Commerce "under U.S. note 6 to subchapter X of chapter 98" of the HTSUS; and appeals "under section 71 of the Plant Variety Protection Act").

Moreover, the appellants' argument fails under *Dalton*, which rejected the Third Circuit's view that the President's authority to close bases was contingent on the Secretary's and the Commission's compliance with various statutory procedures. *Dalton*, 511 U.S. at 476. The statutory provision that defined the President's duties in

*Dalton* directed the President to approve or disapprove the Commission's recommendations, which were made "under" another provision of the statute. *See* Pub. L. No. 101-510, § 2903(e), 104 Stat. 1485, 1812 (1990). Notwithstanding that language, the Supreme Court concluded that "[n]othing in § 2903(e) requires the President to determine whether the Secretary or Commission committed any procedural violations in making their recommendations, nor does § 2903(e) prohibit the President from approving recommendations that are procedurally flawed." 511 U.S. at 476. As such, the statute's delineation of the agency's duties in preparing recommendations did not limit the President's discretion to approve or disapprove the recommendations. *Id.*

The appellants' argument in this case similarly "conflate[s] the duties of the . . . Commission with the authority of the President," in contravention of *Dalton*. 511 U.S. at 476. As was true of the statute in *Dalton*, nothing in 19 U.S.C. § 3006(a) makes the President's authority to act contingent on the Commission's compliance with section 3005's substantial rate neutrality requirement. Nor does section 3006 require the President to review or reject recommendations for non-compliance with section 3005. We therefore reject the appellants' restrictive interpretation of section 3006, as well as their argument that the President exceeded his statutory authority.[2]

---

[2]    The appellants insist that their interpretation of the interplay between 19 U.S.C. §§ 3005 and 3006 must be correct because those statutory provisions are rendered "meaningless" if they do not allow for judicial review. However, a statute that provides for executive action that is not subject to judicial review is not "meaningless" or constitutionally invalid, as the appellants seem to suggest. Despite the "strong presumption that Congress intends judicial review of administrative action," *see*

We also reject the appellants' distinction of *Dalton* on the basis of narrow factual differences, such as the fact that the 1990 Act in *Dalton* provided that in the event of Presidential disapproval, the Base Closure Commission would be required to revise its report. The Supreme Court attached no significance to that fact or to the requirement in the 1990 Act that the President either approve or disapprove the agency's recommendations in their entirety, holding that even under those circumstances the President's discretion was sufficiently broad to foreclose judicial review. *See* 511 U.S. at 465, 476. Under section 3006(a), the President's authority is not constrained in any way by the Commission's recommendations. The statement in section 3006 that the President "may proclaim modifications, based on the recommendations by the Commission under section 3005 of this title, to the Harmonized Tariff Schedule" therefore does not restrict the President's discretion or render the President's actions judicially reviewable.

The only language in section 3006 that limits the President's discretion to proclaim HTSUS modifications is the requirement that the President "determine[] that the modifications — (1) are in conformity with United States obligations under the Convention; and (2) do not run

---

*Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986), Congress has chosen to foreclose judicial review in various instances, *see, e.g.*, *Salmon Spawning & Recovery Alliance v. U.S. Customs & Border Prot.*, 550 F.3d 1121, 1129 (Fed. Cir. 2008). The APA specifically recognizes that there is no judicial review in instances in which Congress has precluded judicial review or in which "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). As noted by *Dalton*, Supreme Court precedent has "fully recognized that the consequence of [certain determinations as to Presidential discretion] [i]s to foreclose judicial review." 511 U.S. at 475.

counter to the national economic interest of the United States." 19 U.S.C. § 3006(a). In *Motions Systems Corp. v. Bush*, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (en banc), this court held that similar language, which "limited to some degree the President's discretion," was insufficient to permit judicial review where there was no suggestion that the President violated those express statutory limits. In that case, Section 421 of the Trade Act of 1974 required the President to order import relief for market disruption due to importation of products from China unless the President determined that import relief was "not in the national economic interest" or "would cause serious harm to [] national security." Because there was "no colorable claim" that those explicit statutory requirements were violated, we held that the President's action was "sufficiently discretionary to preclude judicial review." 437 F.3d at 1361-62.

In this case, as in *Motions Systems*, the appellants do not claim that the President failed to fulfill his statutory mandate under section 3006 to determine whether the Commission's proposed modifications conformed with the Convention and did not run counter to the national economic interest. Rather, the appellants argue that it was improper for the President to adopt modifications that were not rate neutral. As we concluded above, section 3006(a) does not make rate neutrality a condition of the President's decision. Therefore, any claim that the Presidential proclamation does not produce rate neutrality is not subject to judicial review. Moreover, as in *Motions Systems*, the express restrictions in section 3006 on Presidential authority are self-limiting, as it is solely for the President to decide whether to modify the HTSUS in light of the nation's Convention obligations and economic interests. *See* 437 F.3d at 1360.

The appellants argue that our decision in *Corus Group PLC v. International Trade Commission*, 352 F.3d 1351 (Fed. Cir. 2003), removes the present claims from the realm of Presidential discretion under *Dalton* and *Motions Systems*. *Corus*, however, is inapplicable here. *Corus* concerned the President's authority to impose duties on foreign imports pursuant to the "escape clause" provision of the Trade Act of 1974. Under the express terms of that statute, if the Commission's report "contain[s] an affirmative finding regarding serious injury, or the threat thereof, to a domestic industry, the President shall take all appropriate and feasible action" to make a corrective adjustment. *Corus*, 352 F.3d at 1353-54; 19 U.S.C. § 2253(a)(1)(A). The appellant in *Corus* argued that the Commission's determination was negative, not affirmative, thus precluding Presidential action. As to the issue of judicial review, we held that because "[t]he statute only gives the President authority to impose a duty if the Commission makes 'an affirmative finding regarding serious injury,'" the Commission's report, like the Biological Opinion in *Bennett v. Spear*, had "direct and appreciable legal consequences" that rendered it reviewable by the courts. 352 F.3d at 1359. Thus, in *Corus* the President's authority to act turned on the presence or absence of a necessary and independent factual predicate: an affirmative injury finding by the Commission.

Here, by contrast, the statute contains no language that expressly mandates substantial rate neutrality as a prerequisite to the President's authority to proclaim HTSUS modifications. Nor does the statute require any independent predicate to Presidential action. The President's authority under section 3006 turns solely on his assessment of whether the Commission's recommendations are in conformity with the United States' obligations

under the Convention and do not run counter to the nation's economic interests. 19 U.S.C. § 3006(a)(1)-(2). Because those determinations are committed to the President's discretion, and because the President's compliance with paragraphs 1 and 2 of section 3006(a) is not at issue here, the President's exercise of his discretion is not subject to judicial review.

Citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), the appellants contend that judicial review is available because the President has "defie[d] a Congressional mandate" and has thereby "run afoul of the Separation of Powers Doctrine." This case and *Youngstown Sheet & Tube*, however, are antipodes. *Youngstown Sheet & Tube* involved an action against the Secretary of Commerce alleging that his action in seizing the petitioners' steel mills was unauthorized by statute and constitutionally impermissible. This case, by contrast, involves an express legislative grant of discretionary authority to the President and does not implicate any constitutional right of the appellants. *Youngstown Sheet & Tube* therefore provides no support for a right to judicial review in this case.

Although the appellants invoke Justice Jackson's concurring opinion in *Youngstown Sheet & Tube*, we think that another of Justice Jackson's opinions, his opinion for the Court in *Chicago & Southern Air Lines, Inc, v. Waterman Steamship Co.*, 333 U.S. 103 (1948), is more instructive. That case raised the question whether an agency recommendation that was subject to Presidential approval contemplated judicial review at some point in the process. By statute, the Civil Aeronautics Board was charged with granting or denying an application for permission to engage in foreign air transportation, but the Board's order was subject to Presidential review and

approval. Noting Congress's authority to "delegate very large grants of its power over foreign commerce to the President," *id.* at 109, the Supreme Court held that the statutory scheme did not contemplate judicial review of such an order, either before or after the President's decision. As the Court put it, "before Presidential approval it is not a final determination . . . and after Presidential approval the whole order . . . derives its vitality from the exercise of unreviewable Presidential discretion." *Id.* at 113.

An even closer precedent is *United States v. George S. Bush & Co.*, 310 U.S. 371 (1940). In that case, the Supreme Court held that Congress's delegation of power to the President to modify tariff rates pursuant to a recommendation of the Tariff Commission had the effect of barring judicial review, notwithstanding a claim that the Commission's recommendation was legally flawed. The dispute in *George S. Bush* arose after the Tariff Commission recommended an increase in the duty on certain imported products. By statute, the President was given the authority to approve the Commission's recommendations by proclamation if in his judgment the recommended changes were necessary to equalize differences in the cost of production for the domestic and imported products. After the President issued such a proclamation, the Court of Customs and Patent Appeals held the proclamation unlawful based on the court's conclusion that the Commission's recommendation was contrary to the substantive requirements of the governing statute. 310 U.S. at 376-78. The Supreme Court reversed, holding that the Tariff Act "does not permit judicial examination of the judgment of the President that the rates of duty recommended by the Commission are necessary to equalize the differences in the domestic and foreign rates of production." *Id.* at 379. The Court observed that the

Tariff Commission, like its successor the International Trade Commission, served the President

> as an adviser. . . . It does not increase or decrease the rates of duty; it is but the expert body which investigates and submits its facts and its recommendations to the President. It is the judgment of the President on those facts which is determinative of whether or not the recommended rates will be promulgated. In substance and to a great extent in form the action of the Commission and the President is but one stage in the legislative process. . . . And the judgment of the President that on the facts, adduced in pursuance of the procedure prescribed by Congress, a change of rate is necessary is no more subject to judicial review under this statutory scheme than if Congress itself had exercised that judgment.

*Id.* at 379-80 (citations omitted); *see also Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 305 (1933) ("What is done by the Tariff Commission and the President in changing the tariff rates to conform to new conditions is in substance a delegation, though a permissible one, of the legislative process.").

The parallelism between the "recommendation and proclamation" process in the *George S. Bush* case and in this one is striking. In *George S. Bush*, the Supreme Court held that the President's exercise of discretion was not subject to judicial review predicated on a claim of legal error in the Tariff Commission's recommendation, while in this case the trial court held that the President's exercise of discretion was not subject to judicial review based on a claim of legal error in the underlying recommendation of the International Trade Commission. The

similarity between the two cases further confirms that the trial court correctly held that the Presidential proclamation at issue in this case was not reviewable based on the appellants' claim that the Commission's recommendation was legally flawed.

## **AFFIRMED**