# United States Court of Appeals
# for the Federal Circuit

---

**SILFAB SOLAR, INC., HELIENE, INC., CANADIAN SOLAR (USA), INC., CANADIAN SOLAR SOLUTIONS, INC.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, UNITED STATES INTERNATIONAL TRADE COMMISSION, CHAIRMAN RHONDA K. SCHMIDTLEIN, COMMISSIONER KEVIN K. MCALEENAN, OFFICE OF THE U.S. TRADE REPRESENTATIVE, U.S. TRADE REPRESENTATIVE ROBERT E. LIGHTHIZER, SOLARWORLD AMERICAS, INC.,**
*Defendants-Appellees*

**SUNIVA, INC.,**
*Defendant*

---

2018-1718

---

Appeal from the United States Court of International Trade in No. 1:18-cv-00023-TCS, Chief Judge Timothy C. Stanceu.

---

Decided: June 15, 2018

---

JONATHAN THOMAS STOEL, Hogan Lovells US LLP, Washington, DC, argued for plaintiffs-appellants. Also represented by CRAIG ANDERSON LEWIS, MITCHELL REICH, ROBERT B. WOLINSKY.

JEANNE DAVIDSON, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendants-appellees United States, United States Customs and Border Protection, Kevin K. McAleenan, Office of the U.S. Trade Representative, Robert E. Lighthizer. Also represented by CHAD A. READLER, TARA K. HOGAN, JOSHUA E. KURLAND, STEPHEN CARL TOSINI.

JOHN DAVID HENDERSON, Office of the General Counsel, United States International Trade Commission, Washington, DC, argued for defendants-appellees United States International Trade Commission, Rhonda K. Schmidtlein. Also represented by DOMINIC L. BIANCHI, ANDREA C. CASSON.

TIMOTHY C. BRIGHTBILL, Wiley Rein, LLP, Washington, DC, for defendant-appellee SolarWorld Americas, Inc. Also represented by TESSA V. CAPELOTO, LAURA EL-SABAAWI, USHA NEELAKANTAN, MAUREEN E. THORSON.

DANIEL L. PORTER, Curtis, Mallet-Prevost, Colt & Mosle LLP, Washington, DC, for amicus curiae Government of Canada. Also represented by CHRISTOPHER A. DUNN, JAMES P. DURLING.

--------

Before DYK, MOORE, and REYNA, *Circuit Judges*.

DYK, *Circuit Judge*.

Silfab Solar Inc., Heliene Inc., Canadian Solar (USA) Inc., and Canadian Solar Solutions Inc. ("appellants")

sought a preliminary injunction to bar the enforcement of presidentially imposed tariffs on solar products. The Court of International Trade ("CIT") denied the injunction. We affirm. We conclude that the President's actions here were lawful and that accordingly, appellants have not established a probability of success on the merits as required for a preliminary injunction.

BACKGROUND

I

Section 201 of the Trade Act of 1974 is commonly known as the "escape clause" and authorizes the President to impose tariffs under prescribed conditions. Section 201 provides that if the International Trade Commission ("ITC" or "the Commission") determines that

> an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article, the President, in accordance with this part, shall take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs.

19 U.S.C. § 2251(a) (emphases added). Such actions are typically referred to as "safeguard measures." Section 2253(a) provides the same authorization that

> [a]fter receiving a report . . . containing an affirmative finding regarding serious injury, or the threat thereof, to a domestic industry, the President shall take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to

> make a positive adjustment to import competition
> and provide greater economic and social benefits
> than costs.

19 U.S.C. § 2253(a) (emphases added).

In May 2017, a United States manufacturer of solar products, Suniva, Inc., filed a petition with the ITC, requesting that the President undertake measures to protect U.S. solar manufacturers against foreign imports. The goods at issue in this case are crystalline silicon photovoltaic (CSPV) cells, manufactured and sold either as standalone cells or as functional modules. In accordance with Section 2252(b)(1)(A), the ITC conducted an investigation "to determine whether an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article." 19 U.S.C. § 2252(b)(1)(A). On November 17, 2017, the ITC issued a report, in which it made an affirmative serious injury determination under 19 U.S.C. § 2252(b). The ITC determined that solar products were "being imported into the United States in such increased quantities as to be a substantial cause of serious injury to the domestic industry producing an article like or directly competitive with the imported article." J.A. 92.

When making the determination, there were only four Commissioners serving on the ITC. While the four Commissioners were united in their affirmative finding of serious injury, they divided into three groups with respect to relief. Vice Chairman Johanson and Commissioner Williamson recommended a tariff of 30% on imports in excess of 1 gigawatt for the first year. Similarly, Chairman Schmidtlein recommended both tariffs and quotas under which (1) cells that exceed the 0.5 gigawatts volume level would be subject to a 30% tariff, (2) modules would be subject to 35% tariff, and (3) a tariff of 10% *ad*

*valorem* to be instituted on imports of up to 0.5 gigawatts. Commissioner Broadbent recommended a quantitative restriction on cells and modules. Since no recommendation received the assent of "a majority of the commissioners voting" or of "not less than three commissioners," none was an official Commission recommendation under 19 U.S.C. § 1330(d)(2).

After determining that a serious injury was occurring, the ITC reported specifically on imports from Canada. This appeal only involves solar imports from Canada, and not Mexico. The NAFTA Implementation Act requires that

> the International Trade Commission shall also find (and report to the President at the time such injury determination is submitted to the President) whether (1) imports of the article from a NAFTA country, considered individually, account for a substantial share of total imports; and (2) imports of the article from a NAFTA country, considered individually or, in exceptional circumstances, imports from NAFTA countries considered collectively, contribute importantly to the serious injury, or threat thereof, caused by imports.

Pub. L. No. 103-182, 107 Stat. 2057 (1993) (codified at 19 U.S.C. § 3371) (emphases added). The ITC explained in its finding on "substantial share" that Canada contributed only roughly 2% of the relevant solar imports during the applicable period. The industry in Canada was not among the top five suppliers of imports of CSPV products during the relevant time period and, on average, was the ninth-largest source of solar products. The ITC also pointed out that imports from Canada declined between 2015 and 2016, even though global imports continued to increase. A 3-1 majority of the ITC concluded that Canadian imports did not account for a "substantial share" of solar imports.

It further found that Canadian imports did not "contribute importantly" to the serious injury, an issue not pertinent to this appeal.

While Chairman Schmidtlein recommended that the President should not exempt Canadian goods from the safeguard, given their high rate of growth, the other Commissioners recommended excluding Canadian imports. These Commissioners noted that if a surge of imports from Canada took place in the future, the domestic industry had options to pursue relief under the NAFTA import-surge mechanism, 19 U.S.C. § 3372(c). Section 3372(c)(1) provides that if the

> President . . . excludes imports from a NAFTA country or countries from action . . . but thereafter determines that a surge in imports from that country or countries is undermining the effectiveness of the action—(A) the President may take appropriate action . . . to include those imports in the action.

## II

After the ITC makes an affirmative injury determination under Section 2252(b), as noted earlier, the President "shall take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs." 19 U.S.C. § 2253(a)(1)(A). When determining what action to take, the statute directs the President to "take into account" ten factors, ranging from "the recommendation and report of the Commission," to broader considerations such as the national economic interest. 19 U.S.C. § 2253(a)(2).

After the ITC made its report, the Trade Policy Staff Committee ("TPSC") was tasked with offering a remedy recommendation to the President. 19 U.S.C.

§ 2253(a)(1)(C). On behalf of the TPSC, the Office of the United States Trade Representative ("USTR") issued a request for comments and a notice of public hearing about the determination of import injury with regard to CSPV cells. Request for Comments and Public Hearing About the Administration's Action Following a Determination of Import Injury With Regard to Certain Crystalline Silicon Photovoltaic Cells, 82 Fed. Reg. 49,469 (Oct. 25, 2017). After the hearing, the TPSC provided the President with its recommendation concerning appropriate safeguard measures. This recommendation is not a public document and was not supplied to this court.

On January 23, 2018, President Trump issued Proclamation No. 9693, entitled "To Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products) and for Other Purposes." J.A. 74 ("Proclamation"). The Proclamation announced a four year safeguard, including a 30-percent tariff on solar products, whether assembled as cells or modules. As noted earlier, under the NAFTA Statute, the President must determine whether the tariffs apply to Canadian imports. The President acknowledged that the ITC "made negative findings with respect to imports of CSPV products from Canada." J.A. 74, ¶ 3. Notwithstanding this, he determined that "imports of CSPV products from . . . Canada . . . account for a substantial share of total imports and contribute importantly to the serious injury or threat of serious injury found by the ITC." J.A. 75, ¶ 7. Accordingly, he did not exempt Canadian imports. The President's safeguard action, *i.e.*, the tariffs, took effect on February 7, 2018.

III

On the same day, the plaintiffs, three Canadian manufacturers of solar panels and a U.S. importer of solar cells and modules, filed suit in the CIT, seeking a declara-

tory judgment that the Proclamation, as applied to them, is contrary to law and an injunction barring enforcement of the tariffs. Plaintiffs named as defendants the United States, U.S. Customs and Border Protection and its acting Commissioner, the U.S. International Trade Commission and its Chairman, and the Office of the U.S. Trade Representative and the U.S. Trade Representative. Defendant-Intervenors Suniva and SolarWorld, Inc., U.S. manufacturers of solar cells and modules, intervened in support of the President's decision.

Plaintiffs submitted declarations detailing an imminent, severe threat of irreparable injury from the solar tariffs to their businesses and an expert report containing economic analysis of the injury.

## IV

On March 5, 2018, the CIT denied the motion for a preliminary injunction in a careful and thorough opinion. The CIT held that, even if it "presume[d], without deciding" that plaintiffs could demonstrate irreparable harm in the absence of an injunction, and that the balance of hardships weighed in their favor, plaintiffs would not qualify for preliminary relief, because they were not likely to succeed on the merits of their claim and the public interest did not favor a preliminary injunction. J.A. 7. As to the public interest factor, the CIT expressed concern that the nominal bond requested "could expose the government to the risk of being unable to collect safeguard duties owed once the entries are liquidated should it ultimately prevail in this litigation." J.A. 40. Although plaintiffs asked the court to stay proceedings and grant an injunction pending appeal, the CIT denied both motions.

Appellants appealed the denial of the injunction to our court.[1] At this court, they sought, and we denied, a motion for injunction pending appeal. The CIT had jurisdiction pursuant to 28 U.S.C. § 1581(i). We have jurisdiction pursuant to 28 U.S.C. § 1292(c)(1). "The governing standard of review on appeal of a grant or denial of a preliminary injunction is abuse of discretion." *Am. Signature, Inc. v. United States*, 598 F.3d 816, 823 (Fed. Cir. 2010) (citing *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1375 (Fed. Cir. 2009)).

DISCUSSION

I

A preliminary injunction "is an extraordinary remedy." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)). The moving party has to show the following factors in order to obtain a preliminary injunction: (1) likelihood of success on the merits, (2) irreparable harm absent immediate relief, (3) the balance of interests weighing in favor of relief, and (4) that the injunction serves the public interest. *Id.* at 20; *accord Wind Tower Trade Coal. v. United States*, 741 F.3d 89, 95 (Fed. Cir. 2014).

On appeal, the appellants focus primarily on the first factor – likelihood of success on the merits. In *Winter*, the Supreme Court made clear that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief." *Winter*, 555 U.S. at 22. Since *Winter*, we have held that the party seeking the injunction must be able to

---

[1]   At the CIT, plaintiffs also argued for a preliminary injunction on the grounds that the presidential action violated quantitative restriction limitations under 19 U.S.C. § 3372(d). Plaintiffs do not raise this issue on appeal.

"demonstrate that it has at least a fair chance of success on the merits for a preliminary injunction to be appropriate." *Wind Tower*, 741 F.3d at 96 (citing *Qingdao Taifa Grp. Co. v. United States*, 581 F.3d 1375, 1381 (Fed. Cir. 2009)).

Appellants rely on past cases where we have held that the probability of success factor can be decided on a sliding scale, and a lesser showing of likelihood of success is acceptable, where there is a significant showing of irreparable injury. *See, e.g.*, *Belgium v. United States*, 452 F.3d 1289, 1292-93 (Fed. Cir. 2006). Appellants argue that they have shown a strong likelihood of irreparable injury and that, accordingly, only a reduced showing of probability of success should be required. Even accepting (without deciding) the theory that our sliding-scale jurisprudence remains good law after *Winter*, we conclude that appellants have not shown any probability of success on the merits, so that a preliminary injunction would not be appropriate even under the most lenient sliding-scale standard.

## II

Under *Corus* and other decisions of this court, there are limited circumstances when a presidential action may be set aside if the President acts beyond his statutory authority, but such relief is only rarely available. *Corus Grp. PLC v. Int'l. Trade Comm'n*, 352 F.3d 1351, 1356 (Fed. Cir. 2003) (highlighting that review is available to determine whether the President "clear[ly] misconstru[ed]" his statutory authority); *see also Motion Sys. Corp. v. Bush*, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (en banc) (explaining that courts may consider whether "the President has violated an explicit statutory mandate"); *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985) (holding that "[f]or a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action

outside delegated authority"). We conclude that such relief is not available in this case and reject appellants' various arguments to the contrary.

First, appellants argue that the President had no power to act because the ITC made no recommendation as to remedy. The simple answer to this claim is that the President's authority to act is not conditioned on the existence of such a recommendation. It is conditioned only on an ITC's finding of serious injury, or the threat thereof. 19 U.S.C. § 2253 provides that

> [a]fter receiving a report . . . containing an affirmative finding regarding serious injury, or the threat thereof, to a domestic industry, the President shall take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs.

19 U.S.C. § 2253(a) (emphasis added).

In *Corus*, we held that the President lacks authority under Section 2253 to act, unless the ITC makes a determination of serious injury or threat thereof. 352 F.3d at 1354. However, nothing in the statute or in *Corus* suggests that the existence of an ITC recommendation as to remedy is a condition of the President's power to act. Indeed, the statute makes clear that the only condition necessary for the President to take action is the affirmative finding regarding serious injury or the threat thereof. As the CIT pointed out, it is difficult to believe that Congress would have wanted an injury to go unremedied, simply because the ITC's Commissioners could not agree on a particular remedy.

Appellants argue that if the President is allowed to act without an ITC recommendation as to remedy, Con-

gress will not be able to exercise its fast track authority. The statute provides that if "the action taken . . . differs from the action recommended by the Commission under section 2252(e)(1)" a fast track congressional override is available, allowing Congress to institute "the action recommended by the Commission . . . upon the enactment of a joint resolution . . . within the 90-day period beginning on the date on which the [recommendation] is transmitted to the Congress." 19 U.S.C. § 2253(c). We express no opinion about whether, in the absence of a remedy recommendation, Congress has authority to invoke the fast track provision of Section 2253(c). The question of whether the President's action here "differs from the action recommended by the Commission" when the ITC makes no recommendation is a matter for Congress, and not this court.

Second, appellants argue that the statute gives the President authority only if he acts under the statute and that the President cannot do so if the ITC has failed to comply with the statute. Section 2252(f)(1) states that "[t]he Commission shall submit to the President a report on each investigation." While the ITC did not make the required remedy recommendation, we have rejected the contention that the failure of the ITC to comply with its statutory obligations invalidates presidential action. In *Michael Simon Design, Inc. v. United States,* 609 F.3d 1335, 1342-43 (Fed. Cir. 2010), as here, the plaintiff claimed that the President's action was unlawful because the ITC's recommendation failed to comport with the applicable statute. We held that an allegedly unlawful ITC recommendation to the President did not invalidate the President's determination. We explained that a "recommendation does not cease to be made 'under' [the relevant] section . . . simply because the recommendation is assertedly contrary to the substantive requirements of that provision." *Id.* at 1341. This was the case, because, as in *Dalton v. Specter*, 511 U.S. 462, 476 (1994), "[n]othing

in [the relevant statute] requires the President to determine whether the Secretary or Commission committed any procedural violations in making their recommendations, nor does [the relevant statute] prohibit the President from approving recommendations that are procedurally flawed."

Third, appellants argue that the President did not make the required report to Congress. Section 2253(b)(1) requires that

> [o]n the day the President takes action . . . the President <u>shall transmit to Congress a document describing the action and the reasons for taking the action. If the action taken by the President differs from the action required to be recommended by the Commission under section 2252(e)(1) of this title, the President shall state in detail the reasons for the difference</u>.

19 U.S.C. § 2253(b)(1) (emphasis added). In fact, it appears that the President did make a report to Congress. J.A. 829-51. But even if the President had not, or, if the report was in some way deficient, that would not be a ground for setting aside the President's action. Under the statute, the making of the required report is not a condition precedent to valid presidential action, and the failure to make a required report, even if it occurred, is not grounds to set aside the presidential action. In *Michael Simon,* after "the appellants argue[d] that it was improper for the President to adopt modifications that were not rate neutral," we held that "section 3006(a) does not make rate neutrality a condition of the President's decision." 609 F.3d at 1342. Therefore, "any claim that the Presidential proclamation does not produce rate neutrality is not subject to judicial review." *Id.* at 1342-43. This was the case, because "the statute [at issue] contains no language that expressly mandates substantial rate neutrality as a prerequisite to the President's authority to proclaim

HTSUS modifications." *Id*. at 1343. Similarly, the making of a report is not a precondition for presidential action in this case.

Fourth, appellants contend that the President did not consider the ITC report as required by the statute. The statute requires that the President "shall take into account − (A) the recommendation and report of the Commission." 19 U.S.C. § 2253(a)(2). The Proclamation states that the President considered the report. J.A. 74 ¶¶ 2-6 (stating that the President made his decision "[a]fter taking into account the considerations specified in section 203(a)(2) of the Trade Act . . . [including] the ITC Report"). We have no authority to determine whether the President's statement is factually accurate. *See Maple Leaf*, 762 F.2d at 89. To the extent that appellants argue that the President did not take account of the recommendation of the ITC because there was none, this is merely a reprisal of the argument that the President has no authority to act without an ITC recommendation. We addressed and rejected this above.

Finally, appellants argue that the President's action violated the NAFTA Implementation Act, specifically 19 U.S.C. § 3372. Section 3372(a) instructs that, "[i]n determining whether to take action under . . . the Trade Act of 1974 . . . with respect to imports from a NAFTA country, the President shall determine whether" a NAFTA country's exports to the United States "account for a substantial share of total imports" and whether those imports "contribute importantly to the serious injury . . . found by the International Trade Commission." Imports from a NAFTA country will be excluded from the action "if the President makes a negative determination" regarding either substantial share or contribute importantly "with respect to imports from such country." 19 U.S.C. § 3372(b). The President thus must exempt Canada if he

"determines" that Canadian imports do not constitute a "substantial share" of total imports.[2] As set forth in the Proclamation, President Trump determined that "imports of CSPV products from . . . Canada . . . account for a substantial share of total imports." J.A. 75, ¶ 7.

Appellants argue that there is no support for such a determination. Appellants point out that the ITC determined that imports from Canada did not constitute a "substantial share." J.A. 159.[3] The Proclamation itself recognized that the ITC made findings "as to whether imports from . . . Canada, considered individually, account for a substantial share of total imports and contribute importantly to the serious injury, or threat thereof, caused by imports. The ITC . . . made negative findings

_____

[2]    Subsections 3372(a)-(b) provide that

the President shall determine whether − (1) imports from such country, considered individually, account for a substantial share of total imports; or (2) imports from a NAFTA country, considered individually, or in exceptional circumstances imports from NAFTA countries considered collectively, contribute importantly to the serious injury, or threat thereof, found by the International Trade Commission. . . . [And that] [i]n determining the nature and extent of action to be taken under chapter 1 of title II of the Trade Act of 1974 [19 U.S.C.A. § 2251 et seq.], the President shall exclude from such action imports from a NAFTA country if the President makes a negative determination under subsection (a)(1) or (2) of this section with respect to imports from such country.

[3]    Appellants do not argue that the President erred in his "contribute to injury" finding, the second factor required.

with respect to imports of CSPV products from Canada." J.A. 74, ¶ 3. Moreover, according to the record, Canadian imports seem to account for only roughly 2% of the relevant solar imports during the applicable period. The industry in Canada was not among the top five suppliers of imports of CSPV products during the relevant time period, and on average, Canada was only the ninth largest source of solar products. The NAFTA Implementation Act provides that a NAFTA country should "normally" be deemed "to account for a substantial share" only if it is "among the top 5 suppliers" over "the most recent 3-year period." 19 U.S.C. § 3371(b)(1).

The presidential action cannot be set aside because it conflicts with the ITC's conclusion. While the ITC made a negative finding as to substantial share with respect to solar products from Canada, these findings in no way bind the President. Indeed, the ITC has a duty only to find and report regarding determinations of substantial share, and the President is free to reach a different decision regarding those determinations.

Nor do we have authority to review the President's substantial share determination. The question regarding substantial share is factual, and we have no authority to review the President's factual determinations. "The President's findings of fact and the motivations for his action are not subject to review." *Maple Leaf*, 762 F.2d at 89 (citation omitted); *see also United States v. George S. Bush & Co.*, 310 U.S. 371, 379-80 (1940) ("[T]he judgment of the President . . . on the facts . . . is no more subject to judicial review . . . than if Congress itself had exercised that judgment."); *Michael Simon,* 609 F.3d at 1340 ("The language . . . does not implicitly or explicitly limit the President's discretion in a way that would render the President's actions in this case judicially reviewable.").

In particular, courts have repeatedly confirmed that, where the statute authorizes a Presidential "determina-

tion," the courts have no authority to look behind that determination to see if it is supported by the record. *See, e.g.*, *George S. Bush & Co.*, 310 U.S. at 379 (finding no review when the statute committed the decision to the President's "judgment"); *Motion Sys.*, 437 F.3d at 1359 (finding no review when the statute authorized the President to "provide import relief . . . unless the President determines that provision of such relief is not in the national economic interest of the United States"); *Maple Leaf*, 762 F.2d at 87-90 (finding no review of the President's "determin[ations]" under Sections 2251-53 of Title 19 of the U.S. Code). Congress could not have intended that courts review a presidential determination, based on an ITC record, when the President can and does rely on information that is neither public, nor part of that record.

## CONCLUSION

The CIT correctly determined that appellants cannot demonstrate likelihood of success on the merits, and thus we need not consider the other preliminary injunction factors. If Congress desires to eliminate these tariffs or to cabin the President's authority, that is a matter for Congress to address in future legislation, not a matter for this court on this appeal.

## AFFIRMED