NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**AMERICAN INSTITUTE FOR INTERNATIONAL STEEL, INC., SIM-TEX, LP, KURT ORBAN PARTNERS, LLC,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, MARK A. MORGAN, ACTING COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION,**
*Defendants-Appellees*

---

2019-1727

---

Appeal from the United States Court of International Trade in No. 1:18-cv-00152-CRK-JCG-GSK, Judge Claire R. Kelly, Judge Gary S. Katzmann, Judge Jennifer Choe-Groves.

---

Decided: February 28, 2020

---

ALAN MORRISON, George Washington University Law School, Washington, DC, argued for plaintiffs-appellants. Also represented by STEVE CHARNOVITZ; DONALD CAMERON, JR., JULIE MENDOZA, BRADY MILLS, R. WILL PLANERT, Morris, Manning & Martin, LLP, Washington,

DC; GARY N. HORLICK, Law Offices of Gary N. Horlick, Washington, DC; TIMOTHY MEYER, Vanderbilt Law School, Nashville, TN.

TARA K. HOGAN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendants-appellees.  Also represented by JOSEPH H. HUNT, JEANNE DAVIDSON, STEPHEN CARL TOSINI, JOSHUA E. KURLAND.

ILYA SHAPIRO, Cato Institute, Washington, DC, for amicus curiae Cato Institute.

JEFFREY S. GRIMSON, Mowry & Grimson, PLLC, Washington, DC, for amicus curiae Basrai Farms.  Also represented by BRYAN CENKO, JILL CRAMER, KRISTIN HEIM MOWRY; PEGGY CLARKE, Law Offices of Peggy A. Clarke, Washington, DC.

CHARLES ALAN ROTHFELD, Mayer Brown LLP, Washington, DC, for amicus curiae United States Steel Corporation.  Also represented by MATTHEW MCCONKEY.

ALAN H. PRICE, Wiley Rein, LLP, Washington, DC, for amici curiae American Iron and Steel Institute, Steel Manufacturers Association.  Also represented by MAUREEN E. THORSON, JOSHUA S. TURNER, CHRISTOPHER B. WELD.

_____

Before TARANTO, SCHALL, and STOLL, *Circuit Judges.*

TARANTO, *Circuit Judge.*

On March 8, 2018, the President of the United States imposed a 25-percent tariff on certain imported steel products, exercising authority granted to the President by section 232 of the Trade Expansion Act of 1962, as amended, 19 U.S.C. § 1862, a provision that traces its lineage to 1955. *See Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S.

548, 552 (1976).  The American Institute for International Steel, Inc.; Sim-Tex, LP; and Kurt Orban Partners, LLC (collectively, AIIS) sued the United States in the United States Court of International Trade, arguing that the statute is unconstitutional on its face because the authority it confers is so unconstrained as to constitute legislative power that is Congress's alone under Article I of the Constitution and so cannot be delegated.  The Court of International Trade rejected the challenge, concluding that the issue is controlled by the portion of the Supreme Court's *Algonquin* decision that declares section 232 not to violate the nondelegation doctrine. *American Inst. for Int'l Steel, Inc. v. United States*, 376 F. Supp. 3d 1335, 1339–45 (Ct. Int'l Trade 2019).  We agree, and we therefore affirm.

## I

### A

Section 232 begins with mention of two other statutory provisions, codified at 19 U.S.C. §§ 1821, 1351, that grant the President certain discretionary authority regarding tariffs on goods from foreign nations with which the President might enter into executive agreements. *See American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414–15 (2003) (noting longstanding use and approval of such agreements). Section 1821 states that the President "may," for any of the broad trade-related purposes identified in 19 U.S.C. § 1801, enter into trade agreements and, among other things, raise or lower duties (within limits) to carry out such agreements.  19 U.S.C. § 1821.  Section 1351, which dates to 1934, *see* Tariff Act of 1934, ch. 474, 48 Stat. 943, confers similar authority.  19 U.S.C. § 1351.  This court's predecessor, the Court of Customs and Patent Appeals, upheld section 1351 against a delegation-doctrine challenge

in *Ernest E. Marks Co. v. United States*, 117 F.2d 542 (CCPA 1941).[1]

The statute at issue in the present case, section 232, both restricts and adds to the authority granted in 19 U.S.C. §§ 1821 and 1351. It bars any reduction or elimination of duties under those provisions "if the President determines that such reduction or elimination would threaten to impair the national security." 19 U.S.C. § 1862(a). And, in subsections (b) through (d), section 232 provides the President with authority to "adjust the imports" of an article if the Secretary of Commerce, after a process of consultation and information-seeking, "finds that [the] article is being imported into the United States in such quantities or under such circumstances as to

---

[1]    Congress also conferred discretionary tariff authority on the President in 19 U.S.C. §§ 2251–2254, providing for action based on a wide range of considerations, including national security, *id.*, § 2253(a)(2)(I). *See Silfab Solar, Inc. v. United States*, 892 F.3d 1340 (Fed. Cir. 2018) (holding that certain presidential determinations under that authority, the so-called "escape clause," are not judicially reviewable). The Supreme Court has pointed to other grants of authority to the President (some of it discretionary), from the earliest Congresses, involving import or other measures involving foreign commerce or exactions. *See, e.g., United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 322–24 (1936) (historical recitation); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 422 (1935); *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 402 (1928); *B. Altman & Co. v. United States*, 224 U.S. 583 (1912) (applying Tariff Act of 1897, § 3, 30 Stat. 151, 203); *Marshall Field & Co. v. Clark*, 143 U.S. 649, 683–92 (1892). We do not rule on what legal significance those grants, and Supreme Court rulings about them, would have in the absence of *Algonquin*.

threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A).

The statutory process for an adjustment based on national security begins with the Secretary of Commerce performing an "appropriate investigation to determine the effects on the national security of imports of the article." *Id.*, § 1862(b)(1)(A). The statute requires consultation with the Secretary of Defense and other appropriate officers of the United States and, if appropriate, public hearings or receipt of comments from interested persons. *Id.*, § 1862(b)(2)(A). When the investigation is completed, the Secretary of Commerce must provide the President with findings and recommendations for action or inaction. *Id.*, § 1862(b)(3)(A). If the Secretary finds that importation of the article threatens to impair the national security, the President then must determine whether he concurs with the Secretary's findings and, if so, what action to adjust imports, in nature and duration, is necessary to avoid the threat to the national security. *Id.*, § 1862(c)(1)(A).

One possible action is "the negotiation of an agreement which limits or restricts the importation into, or the exportation to, the United States of the article that threatens to impair national security." *Id.*, § 1862(c)(3)(A). If an agreement is not negotiated within 180 days, however, or if an agreement that is reached is not being carried or is ineffective in eliminating the threat, the President "shall" take other actions he deems necessary. *Id.* The statute thus provides leverage, in the form of tariff adjustments, for the President to use in negotiating international executive agreements, much as do 19 U.S.C. §§ 1821 and 1351, though with a specific focus on national security.

Subsection (d) sets forth a number of "relevant factors" to which Secretary and the President shall "give consideration" in making their determinations regarding national security. *Id.*, § 1862(d). These factors include the "domestic production needed for projected national defense

requirements," the "capacity of domestic industries to meet such requirements," and the "requirements of growth of such domestic industries." *Id.* They include, as well, "the impact of foreign competition on the economic welfare of individual domestic industries" and whether the "weakening of our internal economy may impair the national security." *Id.* The statute enumerates other considerations as well, but the enumeration is set forth "without excluding other relevant factors." *Id.*[2]

## B

## 1

On April 19, 2017, pursuant to section 1862, the Secretary of Commerce opened an investigation into the impact of steel imports on the national security. On April 26, 2017, the Commerce Department published a notice in the Federal Register soliciting public comments and setting a public hearing for May 24, 2017. 82 Fed. Reg. 19,205 (Apr. 26, 2017). On January 11, 2018, the Secretary provided the President with a report of findings and recommendations. U.S. Dep't of Commerce, Bureau of Industry and Security, *The Effect of Imports of Steel on the National Security: An*

---

[2] Congress has elsewhere recognized connections between economic interests and national security. *See, e.g.,* 50 U.S.C. § 3043(b) (annual "national security strategy report" must address "economic . . . elements of the national power of the United States"); 8 U.S.C. § 1189(d)(2) ("'[N]ational security' means the national defense, foreign relations, or economic interests of the United States.") (quoted in *Holder v. Humanitarian Law Project*, 561 U.S. 1, 9 (2010)); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375–76 (2000) (holding State's measure preempted by federal statute that conferred on the President "discretion to exercise economic leverage . . . with an eye toward national security").

*Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended* (2018) (*Steel Report*).

The Secretary examined a variety of steel mill products: carbon and alloy flat products, carbon and alloy long products, carbon and alloy pipe and tube products, carbon and alloy semi-finished products, and stainless products. *Id.* at 21–22. He found that steel is important to "national security" because a variety of steel products are needed to support the country's defense and to supply industries that are critical to minimum operations of the economy and government. *Id.* at 23.[3]

The Secretary took account of a conclusion the Secretary of Defense communicated during the investigation and stated as follows in a post-report letter: "[T]he U.S. military requirements for steel and aluminum each only represent about three percent of U.S. production. Therefore, DoD [the Department of Defense] does not believe that the findings in the reports impact the ability of DoD programs to acquire the steel or aluminum necessary to meet national

---

[3]    The Secretary noted that, while neither section 232 nor its implementing regulations, 15 C.F.R. Part 705, defines "national security," the term includes, at least, "national defense." *Steel Report* at 13. He also cited the conclusion of an October 2001 Commerce report prepared under section 232 that "'national defense' includes both defense of the United States directly and the 'ability to project military capabilities globally'" and encompasses the general security and welfare of certain industries critical to the minimum operations of the economy and government. *Id.* (citing U.S. Dep't of Commerce, Bureau of Export Administration, *The Effect of Imports of Iron Ore and Semi-Finished Steel on the National Security* (2001) (*2001 Report*)). The 2001 Report, for its part, notes that earlier section 232 investigations did not include critical industries within the scope of "national security." *2001 Report* at 5.

defense requirements." Letter from James Mattis, Secretary of Defense, to Secretary of Commerce (Feb. 22, 2018); J.A. 3056. That statement does not expressly refer to future DoD steel needs or to the total demand needed for domestic steel plants to sustain, over time, operations that might be needed for future national-security (including defense) needs. The Secretary of Commerce broadened the economic analysis. He found that no company could profitably run a steel mill to supply only defense needs and that there were already no domestic suppliers for some kinds of steel products needed by DoD. *Steel Report* at 23, 45–46. To meet DoD's varied needs, including possible future needs, the Secretary determined, domestic steel mills must attract sufficient commercial business. *Id.* at 23, 46.

The Secretary found that many domestic steel mills had been driven out of business due to declining steel prices, global overcapacity, and unfairly traded steel, *id.* at 33, and that remaining steel mills were financially distressed, *id.* at 37–48. Relying on industry analysts, the Secretary found that, to remain profitable, steel mills generally need to operate at a utilization rate—the amount of production expressed as a percentage of the maximum production capacity—of 80 percent or greater. *Id.* at 47–48. The Secretary found that the average utilization rate was 74 percent for the most recent six-year period and that in 2016 the utilization rate was only 69.4 percent. *Id.* at 47.

The Secretary concluded that the then-current importation of steel threatened the national security by jeopardizing domestic steel production. *Id.* at 56–57. To alleviate this threat, the Secretary recommended immediately implementing tariffs or quotas in an amount sufficient to enable domestic steel plants to operate at utilization levels of at least 80 percent. *Id.* at 58. The Secretary determined that such a utilization rate could be achieved by reducing steel imports from 36 million to 23 million metric tons. *Id.* The Secretary presented several alternatives to achieve that reduction: an import quota limiting imports of steel to

63 percent of 2017 levels; a tariff of 24 percent on all steel imports, no matter the country of origin (on top of already-applicable antidumping or countervailing duties); or a tariff of 53 percent for steel imports from twelve countries (again, on top of already-applicable antidumping or countervailing duties). *Id.* at 59–60.

2

On March 8, 2018, the President issued Proclamation 9705, in which he concurred with the Secretary's findings and imposed a 25-percent tariff, effective March 23, 2018, on all steel articles from all countries—except for Canada and Mexico, which involved recited special circumstances and were already engaged in negotiations with the United States. 83 Fed. Reg. 11,625, 11,626–27 (Mar. 15, 2018). The President determined that the tariff was "necessary and appropriate" and would help "ensure that domestic producers can continue to supply all the steel necessary for critical industries and national defense." *Id.* at 11,626. The President also welcomed any country with which the United States has a security relationship to "discuss . . . alternative ways to address the threatened impairment of the national security caused by imports from that country." *Id.* The President stated that, upon reaching an alternative arrangement with a country, he may "remove or modify the restriction on steel articles imports from that country and, if necessary, make any corresponding adjustments to the tariff as it applies to other countries." *Id.*

On March 22, 2018, the President issued Proclamation 9711, temporarily exempting Australia, Argentina, South Korea, Brazil, and the European Union from the tariff. 83 Fed. Reg. 13,361 (Mar. 28, 2018). The President determined that the United States has an important security interest with each of the exempted sovereigns and that—in light of ongoing negotiations with each—the appropriate way to address the threat to the national security was to continue discussions and increase strategic partnerships,

"including those with respect to reducing global excess capacity." *Id.* at 13,362. The exemption was to last only until May 1, 2018, thereby encouraging the conclusion of satisfactory agreements. *Id.* at 13,362–63.

On April 30, 2018, the President issued Proclamation 9740, reporting that the United States had successfully concluded negotiations with South Korea on an alternative means to address the threat to the national security. 83 Fed. Reg. 20,683 (May 7, 2018). The countries agreed to a "range of measures," including a quota restricting the quantity of articles imported from South Korea. *Id.* The President therefore excluded South Korea from the tariff. *Id.* at 20,684. In the same Proclamation, the President exempted Argentina, Australia, and Brazil, which had reached an agreement in principle with the United States, and postponed until June 1, 2018, the effective date of applicability to Canada, Mexico, and the EU, which were engaged in negotiations sufficiently promising to warrant that postponement. *Id.* at 20,684–85.

On May 31, 2018, the President issued Proclamation 9759, announcing that the United States had agreed with Argentina, Australia, and Brazil on alternative means to reduce excess steel production and capacity. 83 Fed. Reg. 25,857 (June 5, 2018). In light of those agreements, the President determined that steel imports from those countries no longer threaten the national security and, therefore, imports from those countries would be excluded from the tariff. *Id.* at 25,858.

On August 10, 2018, the President issued Proclamation 9772, stating that imports of steel had not declined as much as anticipated and that capacity utilization had not increased to the target level. 158 Fed. Reg. 40,429 (Aug. 15, 2018). Noting that the Secretary's January report recommended applying higher tariffs to a set of countries that includes Turkey (one of the twelve identified by the Secretary, *Steel Report* at 60), the President determined that it

was necessary and appropriate to increase the tariff rate to 50 percent for steel articles imported from Turkey.  158 Fed. Reg. at 40,429–30.

C

On June 27, 2018, AIIS filed a complaint with the Court of International Trade, asserting—without contradiction from the United States—that the Institute's members (including the two other plaintiffs) are adversely affected by the tariffs on imported steel imposed pursuant to section 232.  AIIS did not allege a failure to adhere to required procedures or action beyond the statutory constraints.  AIIS stated a single claim: that section 232, on its face, is an unconstitutional delegation of legislative power to the President.  AIIS sought an injunction against enforcement of the tariff increase imposed under the section. The Court of International Trade had jurisdiction under 28 U.S.C. § 1581(i)(2), (4), and a three-judge panel was designated to hear AIIS's constitutional challenge under 28 U.S.C. § 255.

AIIS filed a motion for summary judgment, and the government moved for judgment on the pleadings.  The Court of International Trade held that the Supreme Court's decision in *Algonquin* requires rejection of the constitutional challenge, and it therefore granted the government's motion.  *American Institute for Int'l Steel*, 376 F. Supp. 3d at 1339–45.  Judge Katzmann, while agreeing that *Algonquin* is controlling, expressed doubt that section 232 should be deemed constitutional in the absence of *Algonquin*. *American Institute for Int'l Steel*, 376 F. Supp. 3d at 1345–52.  The court entered final judgment on March 25, 2019.

AIIS filed a timely notice of appeal that same day.  We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## II

On appeal, AIIS urges that *Algonquin* does not control this case and that section 232 is facially unconstitutional because it improperly delegates legislative authority to the President. We review questions of law de novo. *Princess Cruises, Inc. v. United States*, 201 F.3d 1352, 1357 (Fed. Cir. 2000). Agreeing with the Court of International Trade that *Algonquin* controls, we affirm without deciding what ruling on the constitutional challenge would be proper in the absence of *Algonquin*.

## A

In *Algonquin*, the Court considered a challenge to the President's authority to adjust imports using license fees. Pursuant to section 232, the President had issued a proclamation increasing license fees imposed on certain petroleum products. *Algonquin*, 426 U.S. at 553–55. Several states, along with other complainants, sued the Secretary of the Treasury, alleging that section 232 did not give the President authority to adjust imports using license fees and that, if so read, the provision would be an unconstitutional delegation of legislative authority.[4] *Id.* at 556. The Court upheld the license fees. *Id.* at 558–71.

Decisively for current purposes, the Court began by rejecting the "suggestion that [it] must construe § 232(b) narrowly in order to avoid a serious question of unconstitutional delegation of legislative power." *Id.* at 558–59 (internal quotation marks omitted). The Court

---

[4]    At the time of *Algonquin*, section 232 gave the Secretary of the Treasury the responsibilities now given to the Secretary of Commerce—to whom Congress transferred the responsibilities effective January 2, 1980, as part of an Executive Branch reorganization. *See* Reorganization Plan No. 3 of 1979—Reorganization of Functions Relating to International Trade, § 5(a)(1)(B), 93 Stat. 1381, 1383.

ruled: "Even if § 232(b) is read to authorize the imposition of a license fee system, the standards that it provides the President in its implementation are clearly sufficient to meet any delegation doctrine attack." *Id.* at 559.

Specifically, the Court quoted its ruling in *J.W. Hampton, Jr., & Co. v. United States* that there is no forbidden delegation if "Congress shall lay down by legislative act an intelligible principle to which the [President] is directed to conform," 276 U.S. 394, 409 (1928), and concluded that "[s]ection 232(b) easily fulfills that test." 426 U.S. at 559. The Court explained that section 232 "establishes clear preconditions to Presidential action"—the Secretary's finding that an article is being imported in such quantities and under such circumstances as to threaten the national security—and that "the leeway that the statute gives the President in deciding what action to take in the event the preconditions are fulfilled is far from unbounded." *Id.* The Court added that the President "can act only to the extent 'he deems necessary to adjust the imports . . . so that such imports will not threaten to impair the national security'" and that the statute "articulates a series of specific factors to be considered by the President." *Id.* (quoting 19 U.S.C. § 1862(b) (1975)); *see also* Trade Act of 1974, Pub. L. No. 93-618, § 127(d), 88 Stat. 1978, 1993 (1975). For those reasons, the Court held that there was "no looming problem of improper delegation." *Id.* at 560.

B

The Court's ruling in *Algonquin* answers the question of the constitutionality of section 232 presented here. The Court's rejection of the nondelegation-doctrine challenge to section 232 was a necessary step in the Court's rationale for ultimately construing the statute as it did, and the constitutional ruling is therefore binding precedent. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to

that result by which we are bound."). Moreover, the rationale of the Court's rejection of the nondelegation-doctrine challenge rests on the determination that the standards governing the President's and Secretary's determinations under section 232 are constitutionally adequate. The same standards are at issue here.

The court did not limit its reasoning in the delegation-doctrine portion of its opinion to the license-fee authority in dispute in *Algonquin*. When the Court said at the end of its opinion that its "holding . . . is a limited one," *Algonquin*, 426 U.S. at 571, it was not curtailing its nondelegation holding. Rather, it was referring to its statutory-construction ruling. The Court explained what it meant by "limited": the conclusion that "the imposition of a license fee is authorized by § 232(b) in no way compels the further conclusion that *any* action the President might take, as long as it has even a remote impact on imports, is also so authorized." *Id.* That caution about what actions might be outside section 232's authorization does not narrow the Court's conclusion that section 232 is not an unconstitutional delegation of legislative authority.

In any event, we see no basis on which *Algonquin* can be properly distinguished for purposes of the question presented here. For one thing, the tariffs at issue here are "monetary exactions," like the "license fees" that were at issue, and contrasted with "quotas," in *Algonquin*. *Id.* at 552. Even if *Algonquin*'s nondelegation ruling were viewed as tied to the form of presidential action authorized, AIIS has presented no persuasive explanation for distinguishing the tariffs at issue here from the license fees at issue there. For another, AIIS's claim is a claim of unconstitutionality of the statutory provision on its face, that is, in all its applications. *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) ("A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications."). *Algonquin* necessarily rejected that claim when it

held that there was no constitutional problem with the grant of authority in section 232.

C

AIIS argues that later decisions of the Supreme Court have undermined at least one crucial premise of *Algonquin*, making it no longer binding.  But the Supreme Court has ruled: "If a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions."  *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).  If there are cases justifying an exception to that principle, this case is not one of them.

We will not project an overruling of the delegation-doctrine standard stated in *Hampton* on which *Algonquin* rested.  Five members of the Court have recently expressed interest in at least exploring a reconsideration of that standard.  *See Gundy v. United States*, 139 S. Ct. 2116, 2131–42 (2019) (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.); *id.* at 2130–31 (Alito, J., concurring in the judgment); *Paul v. United States*, 140 S. Ct. 342 (2019) (mem.) (Kavanaugh, J., statement respecting the denial of certiorari) (stating that the issues raised in the *Gundy* dissent "may warrant further consideration in future cases").  But such expressions give us neither a license to disregard the currently governing precedent nor a substitute standard to apply.

We do not have full briefing on issues that might demand exploration under a standard different from the one stated in *Hampton*.  Such issues might include the significance of text, history, and precedent bearing on circumstances in which Congress, exercising its constitutional power, strengthens authority within the President's "independent" constitutional power.  *See Loving v. United*

*States*, 517 U.S. 748, 772 (1996) (explaining that the delegation doctrine is less restrictive in such circumstances, citing *United States v. Mazurie*, 419 U.S. 544, 556–57 (1975), and *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319–22 (1936)); *see also Gundy*, 139 S. Ct. at 2136 (Gorsuch, J., dissenting); *cf. Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083–84 (2015) (stating that the Court uses "Justice Jackson's familiar tripartite framework" from *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635–38 (1952) (concurring opinion), under which the President's authority is greatest when supported by Congress.   The Supreme Court has recognized that the President has some independent constitutional authority over national security and dealings with foreign nations, including in the form of executive agreements.  *See, e.g.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) (national security); *American Ins. Ass'n*, 539 U.S. at 414–15 (executive agreements); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2419–20 (2018) ("The upshot of our cases in this context is clear: 'Any rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,' and our inquiry into matters of entry and national security is highly constrained." (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)).  We will not guess at precisely what analysis might be needed in the absence of *Algonquin* or conduct such an analysis without the parties' briefing developed under any new standard.

AIIS argues that one pertinent change of law has already occurred.  It argues that decisions of the Supreme Court after *Algonquin*—particularly *Franklin v. Massachusetts*, 505 U.S. 788 (1992), and *Dalton v. Specter*, 511 U.S. 462 (1994)—foreclose judicial review that would have been available at the time *Algonquin* was decided.  We see no basis in this argument for declaring *Algonquin* to be no longer binding.  Nothing in *Algonquin*'s analysis rests on a

premise about judicial review that later Supreme Court decisions have changed.

In *Franklin*, the Court ruled that the President's actions are not reviewable under the Administrative Procedure Act (APA) because the President is not an "agency." *Franklin*, 505 U.S. at 800–01. In *Dalton*, the Court ruled that recommendations and reports submitted to the President are not reviewable under the APA—because they are not final agency actions—when the President has discretion whether to act pursuant to such recommendations and reports. *Dalton*, 511 U.S. at 469–70; *see Franklin*, 505 U.S. at 796–98. But the Court's analysis in *Algonquin* does not turn on APA review of the President's action, or of the Secretary's findings and recommendations, under section 232.

To the extent that AIIS suggests that the Court in *Algonquin* presupposed the availability of judicial review of the factual or discretionary presidential determinations under section 232, there is no basis for such a suggestion. Nor has AIIS established that, at the time of *Algonquin*, such judicial review was available. *See United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940) ("For the judiciary to probe the reasoning which underlies this Proclamation would amount to a clear invasion of the legislative and executive domains. Under the Constitution it is exclusively for Congress, or those to whom it delegates authority, to determine what tariffs shall be imposed."); *Dalton*, 511 U.S. at 474 (indicating that discretionary presidential decisions were already unreviewable under longstanding case law); *American Inst. for Int'l Steel*, 376 F. Supp. 3d at 1341–42 (citing authorities).

At the same time, in *Algonquin* the Court did rule on the statutory issue of whether section 232 authorized license fees (not just quotas) as well as on the constitutional challenge. But AIIS has not identified any material change in the availability of judicial review in those respects. It is enough to say that some non-APA review remains

available for constitutional issues, questions about the scope of statutory authority, and compliance with procedural requirements. *See Dalton*, 511 U.S. at 474; *Franklin*, 505 U.S. at 801; *Dames & Moore v. Regan*, 453 U.S. 654, 669–74 (1981); *Silfab Solar*, 892 F.3d at 1346 (citing *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985) ("For a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority.")). The government has agreed, in its brief, Appellee Br. at 24, and at oral argument, Oral Arg. at 16:25–17:06, http://oral arguments.cafc.uscourts.gov/default.aspx?fl=2019-1727. mp3. In short, there has been no material change to the judicial review of presidential action pursuant to section 232 that undermines the controlling force of *Algonquin*.

## III

For the foregoing reasons, we affirm the judgment of the Court of International Trade.

## **AFFIRMED**